[Cite as *State ex rel. Amanda Bent Bolt Co. v. Indus. Comm.*, 2015-Ohio-3487.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [State ex rel.] Amanda Bent Bolt Company, | : | |
| Relator, | : | |
| v. | : | No. 14AP-295 |
| Industrial Commission of Ohio and Gregory J. Youtsey, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

D E C I S I O N

Rendered on August 27, 2015

*Hahn Loeser & Parks LLP,* and *Douglas J. Suter*, for relator.

*Michael DeWine*, Attorney General, and *Eric J. Tarbox,* for respondent Industrial Commission of Ohio.

*Reminger Co., L.P.A.,* and *Kevin R. Sanislo,* for respondent Gregory J. Youtsey.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

KLATT, J.

{¶ 1} Relator, Amanda Bent Bolt Company, commenced this original action in mandamus seeking an order compelling respondent, Industrial Commission of Ohio ("commission"), to vacate its October 8, 2013 order granting the application of respondent, Gregory J. Youtsey ("claimant") for an additional award for violation of a specific safety requirement ("VSSR"), and to enter an order denying the VSSR application.

{¶ 2}  Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto.  The magistrate found that:  (1) Ohio Adm.Code 4123:1-5-11(E) plainly apprised relator of its duty to properly adjust the pull guard prior to the claimant's operation of the press so that his hands were prevented from reaching the danger zone during the press operating cycle; and (2) the commission did not abuse its discretion in finding that the unilateral negligence defense did not apply to absolve relator from VSSR liability.  Therefore, the magistrate has recommended that we deny relator's request for a writ of mandamus.

{¶ 3}  Relator has filed objections the magistrate's decision.  In its first objection, relator contends that Ohio Adm.Code 4123:1-5-11(E)(4) and (5) are not specific enough to plainly apprise an employer of its legal obligation to protect its employees from a known hazard.  We disagree.

{¶ 4}  As noted by the magistrate, Ohio Adm.Code 4123:1-5-11(E)(4) states that every hydraulic or pneumatic press "shall be guarded, to prevent the hands or fingers of the operator from entering the danger zone during the operating cycle."  The rule further states that "movement of the ram will pull the operator's hands from the danger zone during the operating cycle."  The rule plainly apprised relator that the pull guard it provided for the press must pull the operator's hands from the danger zone during the operating cycle.  This included the duty to properly adjust the pull guard prior to the claimant's operation of the press so that the operator's hands are pulled from the danger zone during the operating cycle.  Here, the pull guard did not pull the claimant's hands from the danger zone during the operating cycle because the pull guard was not properly adjusted.  The commission did not abuse its discretion in interpreting its rule and in granting the claimant's VSSR application under these circumstances.  Therefore, we overrule relator's first objection.

{¶ 5}  In its second objection, relator contends that the magistrate erred by rejecting its affirmative defense of unforeseeable employee misconduct.  Again, we disagree.

{¶ 6}  It is well-settled that a claimant's alleged negligence is a defense only when the employer has first complied with the relevant safety requirements and the claimant

deliberately renders an otherwise complying device noncompliant. *State ex rel. Coffman v. Indus. Comm.*, 109 Ohio St.3d 298, 2006-Ohio-2421, ¶ 13; *State ex rel. R.E.H. Co. v. Indus. Comm.*, 79 Ohio St.3d 352, 355 (1997). We agree with the magistrate's reasoning that because relator failed to properly adjust the pull guard prior to the claimant's operation of the press, the safety device was not complying, and the commission did not abuse its discretion when it rejected relator's unilateral negligence defense to the VSSR violation. Therefore, we overrule relator's second objection.

{¶ 7} Following an independent review of this matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny relator's request for a writ of mandamus.

*Objections overruled; writ of mandamus denied.*

BROWN, P.J., and BRUNNER, J., concur.

———————————

## APPENDIX

### IN THE COURT OF APPEALS OF OHIO

### TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| [State ex rel.] Amanda Bent Bolt Company, | : | |
| Relator, | : | |
| v. | : | No. 14AP-295 |
| Industrial Commission of Ohio and Gregory J. Youtsey, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

### MAGISTRATE'S DECISION

#### Rendered on January 29, 2015

*Hahn Loeser & Parks LLP,* and *Douglas J. Suter*, for relator.

*Michael DeWine*, Attorney General, and *Eric J. Tarbox,* for respondent Industrial Commission of Ohio.

*Reminger Co., L.P.A.,* and *Kevin R. Sanislo,* for respondent Gregory J. Youtsey.

### IN MANDAMUS

{¶ 8} In this original action, relator, Amanda Bent Bolt Company ("relator" or "Amanda"), requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate the October 8, 2013 order of its staff hearing officer ("SHO") that granted the application of respondent Gregory J. Youtsey ("Youtsey") for an additional award for violation of a specific safety requirement ("VSSR"), and to enter an order denying the VSSR application.

Findings of Fact:

{¶ 9}  1. On March 20, 2012, while operating a pneumatic press, Youtsey was injured in the course of and arising out of his employment with Amanda.  His left hand was crushed and portions of two fingers were traumatically amputated.

{¶ 10}  2.  In Youtsey's brief filed in this action, he presents his statement of facts. *See* Loc.R. 13(J)(3), regarding briefs filed in an original action.  Without adopting all of Youtsey's factual assertions as true, the magistrate, nevertheless, finds Youtsey's version of the facts relating to the injury and Amanda's subsequent investigation to be useful to an understanding of this action:

> Youtsey * * * was operating a four-hundred ton Toledo Press/Minster Clutch knuckle-press machine when he was injured on March 20, 2012. * * * On [that] day * * * Youtsey arrived at work and began to review his assignment for the day and then paged for a safety set for press 400. * * * Chuck Hurst is a setup man for [Amanda], which means he is responsible for setting the safeties on the machines. * * * The only individuals who are [allowed] to set the safeties * * * are the safety setup persons. * * * Chuck Hurst adjusted the hand pull-guards for Youtsey on Machine No. 400 by jogging the ram/arm down to make sure his hands were not in the pinch point. * * * Youtsey noticed that his left guard had too much slack [so] he brought it to Hurst's attention. * * * Hurst instructed Youtsey to run the machine through the quality control check and to inform him if the safeties still did not seem right. * * * After the quality check, Youtsey still felt that his guards were improperly adjusted, so he again paged Hurst back to the press. * * * Hurst again jogged the machine in an attempt to get the guards in place. * * * Hurst informed Youtsey that if he still felt uncomfortable that he could have the foreman, Bruce Losey, come and check on the safety guard later, but [Losey] was "really busy" at the time. * * *
>
> After running the press for approximately three hours and fifteen minutes, Youtsey's left hand was [injured] under the ram in the danger zone. * * * The hand that was crushed, **the left**, was crushed by the same guard Youtsey told Hurst was too loose.
>
> Machine No. 400 was only equipped with safety straps attached to the operator's wrists, and the machine via cables. * * * Once the press was activated, the arm/ram would go down and the safeties, when properly adjusted, were

> supposed to pull the operator's hands out of the danger zone. * * * The only safety device on Machine No. 400 on March 20, 2012, to prevent Youtsey's hands from being in the pinch point was the hand pull-back device. * * *
>
> After the injury, Ms. Putterbaugh, the Employer's Human Resource Manager, completed her own investigation of the industrial injury. * * * During her investigation, Ms. Putterbaugh had Mr. Hurst setup the safety pull-guard on machine No. 400 for her. * * * Again, Hurst failed to properly set up the safety guard, as Ms. Putterbaugh could reach the pinch point area with her left hand. * * * As a result of the accident, Mr. Hurst, the safety setup man, was disciplined by [Amanda] for failing to setup the safety pull-guards correctly resulting in an injury to a press operator. * * * Mr. Losey, the foreman also did his own inspection and concluded that the safety pull-guard was not properly adjusted to fit Youtsey.

(Relator's brief, 3-6.) (Emphasis sic.)

{¶ 11} 3. On October 17, 2012, Youtsey filed a VSSR application.

{¶ 12} 4. The VSSR application prompted an investigation by the Safety Violations Investigative Unit ("SVIU") of the Ohio Bureau of Workers' Compensation ("bureau").

{¶ 13} 5. On January 3, 2013, the SVIU special investigator conducted an on-site investigation at the Amanda plant where the injury occurred. The special investigator met with Amanda's counsel and Ms. Polly Putterbaugh, who is Amanda's human resource manager.

{¶ 14} 6. On January 8, 2013, the SVIU special investigator issued his report of investigation. In his report, the special investigator presented the factual scenario that Amanda had presented to him at the January 3, 2013 on-site meeting:

> [Three] The employer states that the claimant was hired on October 12, 2011 as a machine press operator. Claimant's job duties included operating various presses and metal bending machines within the plant. He also measured completed work pieces to verify conformance to specifications, by utilizing gauges, calipers, templates, and/or rulers. He also reviewed work orders, blueprints and production schedules to determine specifications, such as which materials to be used, locations of cutting lines, and dimensions and tolerances. The claimant also performed other job tasks as directed by his supervisor.

[Four] The employer stated that the training the claimant received included a new hire orientation where the claimant received in-class training/programs covering company policies & procedures, and work safety/plant operations with the human resources manager. Employer states that all new personnel received a two week hands-on and on-the-job training period. Employer also states that advance machine operation is provided to those assigned those duties. The claimant was assigned to a machine operator/training and provided instruction on the various machine operations within the plant. The employer reported that during the machine operation job training, personal safety is stressed.

[Five] The employer further states that safety meetings are held once per month. The meetings stress work related safety, machine and equipment awareness and skills operation along with standard policies and procedures.

[Six] The employer states that on March 20, 2012 the date of the claimant's injury, the claimant was assigned as a press operator to machine press #400. Claimant reviewed his production instructions and contacted Charles [Hurst] the machine set-up person. After completing the set-up of press #400, the claimant attached the required safety pullbacks to each of his wrists and proceeded operation of the press and production of parts. During the press operation the claimant ran some test parts for quality check purposes. The employer states that the claimant had Mr. [Hurst] recheck the pullback set-up on press machine #400.

[Seven] Per the employer, once the pullbacks were examined by [Hurst] the claimant resumed operating #400 press for approximately two (2) hours and 45 minutes. Employer states that the claimant took a 15 minute break and then resumed running parts. Employer states that sometime after his return from break, the claimant sustained an injury to his left hand. The shift foreman was notified by the claimant regarding his injury and a call to 911 was made.

[Eight] The employer states that during its investigation, tests were conducted on the 400 Ton Toledo Press/Minster Clutch #664 Knuckle Press machine and no faults were found with any of the machine's operation or parts. However, the employer reports they did identify that the set-up operator failed to properly set the pullback devices in a manner which would operate as designed. Furthermore, the employer points out that the claimant failed to properly

> communicate with the shift foreman when he discovered that his wrist pullback safety system was not set properly. Employer also states that all personnel are trained to notify their foreman if there are any problems which arise during the shift especially in matters involving safety.

(Emphasis sic.)

{¶ 15} 7. During his investigation, the SVIU special investigator obtained an affidavit from Youtsey executed December 20, 2012, the affidavit states in part:

> [Four] On March 20, 2012 the date of my injury I had reported to my 3:30 pm to 12:00 am shift at the Amanda Bent Bolt Company. I reported to machine press #400 w[h]ere I was assigned for the shift. I took a few minutes to review my work instructions after which I went to the phone and paged that I needed a safety set at machine press #400, hung up the phone and returned to the press.
>
> [Five] A few moments later set up guy Chuck [Hurst] came over to the press and did the set up. After he completed that I put on a set of safety straps on my wrist and waited on [Hurst]'s instructions. [Hurst] ran the ram up and down then started checking the pinch points. [Hurst] said ok, and told me to reach in so he could see. I then clipped my safety cable leading from the press on my safety straps located on my wrist and began to reach in as I was instructed by [Hurst].
>
> [Six] I pulled my arms out and began to step back as [Hurst] jogged the ram down some more. Again [Hurst] told me to reach in so he could see my reach. I reached in again and [Hurst] told me "ok you're good." I then grabbed my scan sheet and scanned onto production. I walked back to press #400 to run the first 5 parts on the day so I could compare them to my blue part and gauge them.
>
> [Seven] I noticed that my left safety cable felt loose compared to my right when I was clipping my cables on my wrist restraints. I then began to run first 5 parts and I didn't like how the safety cables felt so I unclipped them and went back to page [Hurst] to come back and double check my safeties. After a few minutes [Hurst] returned and I clipped the safety cables back on my wrist and waited for instructions. [Hurst] ask[ed] what was wrong and I explained that the left safety cable felt loose. [Hurst] then

jogged the ram up and down and instructed me to stand back.

[Eight] [Hurst] then stopped it at a certain point and told me to reach in, I reached in while he was there and then instructed me to stand back, and he then began jogging the ram down again where he stopped it again. [Hurst] told me to reach in again while he examined it. [Hurst] told me to run it and that I was fine and he assured me I couldn't get my hands in the die. So I started running the press on production like I normally would.

[Nine] I ran the press for approximately 2 hours 45 minutes. I then took a 15 minute break at 6:15 pm and finished 6:30 pm where I returned to press #400 [and] clipped on my safety equipment. I then began to run parts continuously for 1/2 hours. When I reached in to get a part out of the die [is] when [the] ram stopped with my left hand.

[Ten] I was looking down at my right hand to grab a part out of my tray in front of me when I noticed pressure on my left hand and [that] was when I noticed that the press rolled over and smashed my left hand and fingers.

{¶ 16} 8. On October 8, 2013, the VSSR application was heard by an SHO. The hearing was recorded and transcribed for the record. Following the hearing, the SHO issued an order finding that relator had violated the specific safety rule set forth at Ohio Adm.Code 4123:1-5-11(E) and that relator's violation of the rule was the proximate cause of the injury.

{¶ 17} 9. The October 8, 2013 order of the SHO explains:

It is the order of the Staff Hearing Officer that the Injured Worker was employed on the date of injury noted above, by the Employer as a pneumatic press operator; that the Injured Worker sustained an injury in the course of and arising out of employment when the Injured Worker was operating a pneumatic press (machine #400) on 03/20/2012.

The pneumatic press was the 400 Ton Toledo Press/Minster Clutch #664 Knuckle Press machine. This machine was purchased on 09/26/1989 according to the purchase invoice. * * *

The Injured Worker was assigned to work on press #400 on the day of injury. After reading his job instructions, the

Injured Worker paged a safety setup person to press #400 to set up his safety pull-guards on the machine. The safety setup person, Chuck [Hurst], came to the machine and checked the pinch points of the machine with the Injured Worker's reach with both arms into the machine.

The safety guard for this press machine [was] pull-guards. The pull-guard consists of safety straps, which are attached to the Injured Worker's wrists, and two cables which are connected to the ram of the machine, and travel above the machine, and around the back of the Injured Worker and attach onto both wrist safety straps.

The safety setup of the pull-guards which consist of safety cables can only be performed by the safety setup person per the Injured Worker's testimony at hearing. The safety setup person is to check the ram pinch points with the distance of the operator's hands when the ram engages and comes down.

The setup person is to assure the operator's hands and fingers do not enter the danger zone, which are the pinch points caused by the ram coming down and making contact. The danger zone is the point of operation where a known hazard exists. In this particular case, the danger zones are the location of the pinch points, where the ram makes contact with another material.

Mr. [Hurst] set up press #400 on 03/20/2012 and instructed the Injured Worker that he was set to operate the machine. The Injured Worker felt the left safety cable was loose compared to the right hand and wrist cable.

The Injured Worker testified at hearing that he informed Mr. [Hurst] that his left side did not feel right as the left cable had more slack. Mr. [Hurst] told the Injured Worker to run his first five parts, which are quality control parts. After the Injured Worker ran the five parts, he paged Mr. [Hurst] to check the safety cables which pull his arms out of the press. Mr. [Hurst] rechecked the machine and indicated that the Injured Worker's safeties (as they are referred as) were good. Mr. [Hurst] told the Injured Worker to run the press. Mr. [Hurst] also told the Injured Worker that "Bruce" (Losey) the Injured Worker's foreman was really busy at that time per the Injured Worker's testimony at hearing.

After running the press for approximately 3 hours and 15 minutes [sic], the Injured Worker's left hand was caught

under the ram in the danger zone. The Injured Worker severed two finger tips on his left hand, sustained a crush injury to his left hand, and significant injuries to three fingers on his left hand. The Injured Worker alleges a violation of specific safety rule O.A.C. 4123:1-5-11(E) due to the Employer's failure to prevent a pneumatic press operator's hand or fingers from entering the danger zone during the operating cycle.

It is further the finding of the Staff Hearing Officer that the Injured Worker's injury was the result of the left safety pull-guard/hold-back guard was not properly and correctly set up on press #400. The improper setup of the left pull-guard/hold-back guard rendered this guard (which was designed to prevent the Injured Worker's left hand from entering the danger zone during the operating cycle of the press) ineffective. The Staff Hearing Officer finds the left safety pull-guard, also known as a hold-back guard, was not effective as it was not properly setup by Mr. [Hurst] when he performed the initial setup of the safety guard apparatus for the Injured Worker at the commencement of the Injured Worker's work shift on 03/20/2012.

It was undisputed by both parties at the hearing that the Injured Worker's left hand safety pull-guard was not properly set up to prevent the Injured Worker's left hand from meeting the pinch points during the press operating cycle.

Following the injury, Ms. Putterbaugh, the Employer's Human Resource Manager, completed her own investigation of the 03/20/2012 industrial injury. Ms. Putterbaugh, a former press operator on machine #400, had Mr. [Hurst] setup the safety pull-guard (hold-back guard) on machine #400 for her. Mr. [Hurst] did not properly setup Ms. Putterbaugh's left safety pull-guard on machine #400 as Ms. Putterbaugh could reach the pinch point area with her left hand per Ms. Putterbaugh's testimony at hearing. The left pull-guard did not prevent Ms. Putterbaugh's left hand and fingers from entering the danger zone per Ms. Putterbaugh's testimony at hearing.

Mr. [Hurst], the safety setup person for the Employer, was disciplined by the Employer for failing to setup the safety pull-backs correctly and resulting in an injury to a press operator on 03/20/2012. * * *

Mr. Losey, the Injured Worker's foreman, also performed a post-injury investigation of the safety pull-guards. He concluded that the safety pull-guard was not properly setup per Mr. Losey's written statement. * * *

Both Ms. Putterbaugh and Mr. Losey concluded that the safety devices were <u>NOT</u> properly adjusted per the Employer's Accident Analysis Report completed on 03/21/2012.

At hearing, the Employer acknowledged that the safety pull-guards for the Injured Worker were not properly set on 03/20/2012, per Ms. Putterbaugh's testimony at hearing * * *.

Based on testimony at hearing from the Injured Worker and Ms. Putterbaugh and based upon the SVIU Exhibits enumerated herein, the Staff Hearing Officer finds there was not a guard in place at the time of the 03/20/2012 industrial injury to prevent the Injured Worker's hand or fingers from entering the danger zone during the operating cycle as required by O.A.C. 4123:1-5-11(E) the Code of Specific Requirements of the Industrial Commission relating to guarding of pneumatic presses to prevent the hands or fingers of the operator from entering the danger zone during the operating cycle.

* * *

The Staff Hearing Officer finds the Injured Worker's industrial injury was due to the fact that the left safety pull-guard was not properly setup and adjusted in order to prevent his left hand and fingers from entering the danger zone. Since the left safety pull-guard was not properly setup, the pull-guard was rendered ineffective.

The Staff Hearing Officer does not find the Injured Worker's failure to report his safety concern to his foreman, Mr. Losey, was the proximate cause of the industrial injury. The Employer argued that employees were instructed at numerous monthly safety meetings to report any safety concerns to their foreman immediately. The Employer alleged that the Injured Worker's failure to report his safety concern was the proximate cause of the Injured Worker's injury. The Employer alleges the Injured Worker's unforeseen misconduct (failure to report his safety concerns to his foreman) was the proximate cause of the injury.

The Staff Hearing Officer finds the left safety pull-guard was improperly setup and that the improper setup of the left pull-guard rendered the guard ineffective in preventing the Injured Worker's left hand and fingers from entering the danger zone. The Hearing Officer does not find the Injured Worker's failure to report his concern about the left safety guard to Mr. Losey (his foreman) was the proximate cause of the Injured Worker's industrial injury.

The Staff Hearing Officer relies on [*State ex rel. Rockwell Internatl. v. Indus. Comm.*, 10th Dist. No. 79AP-720 (June 3, 1980)] and State ex rel. Coffman v. Indus. Comm. (2006) 109 Ohio St.3d 298.

Per the Rockwell case, the Court found the employee's injury was the proximate result of the pull-back guards not being properly adjusted by the Employer so as to prevent the employee's hands or fingers from entering the danger zone during a punch press operation. The employee was wearing the pull-guard safety at the time of the injury but they were not adjusted to keep fingertips from the danger area. The Court held that the safety device had not failed but rather it was not properly adjusted to the employee's hands and arms as required by the specific safety requirement.

In this claim, there was no mechanical failure. The industrial injury was proximately related to the improper adjustment and setup of the left safety pull-guard. The Employer's post-injury investigation found no mechanical failure and concluded that the Injured Worker's injury was due to improper setup of the left pull-guard.

Furthermore, the Staff Hearing Officer finds an employee's unilateral negligence would bar a finding of a violation of a specific safety requirement only if the Employer first complied with the applicable specific safety requirement per the Coffman case. The Staff Hearing Officer finds the Employer had NOT complied with O.A.C. 4123:1-5-11(E) to begin with. The Employer did not initially setup the Injured Worker's left safety pull-guard to comply with the specific safety requirement of O.A.C. 4123:1-5-11(E) as the Injured Worker's left hand and fingers were not guarded from entering the danger zone. Per the Coffman case, the Employer had not initially complied with the specific safety requirement. Therefore, the Injured Worker's failure to report his concern to his foreman was inconsequential.

> The Staff Hearing Officer notes two prior industrial injuries were sustained on this pneumatic press. Two other employee's had injuries to fingers and hands due to failure to properly protect employee's fingers from the danger zone.
>
> It is therefore ordered that an additional award of compensation be granted to the Injured Worker in the amount of 50 percent of the maximum weekly rate under the rule of <u>State ex rel. Engle v. Indus. Comm.</u> (1944), 142 Ohio St. 425.

(Emphasis sic.)

{¶ 18} 10.  Relator moved for rehearing pursuant to Ohio Adm.Code 4121-3-20(E).

{¶ 19} 11.  On April 3, 2014, another SHO mailed an order denying rehearing.  The SHO's order explains:

> It is hereby ordered that the Motion for Rehearing filed 02/28/2014 be denied. The Employer has not submitted any new and relevant evidence nor shown that the order of 10/08/2013 was based on an obvious mistake of fact or on a clear mistake of law.
>
> Particularly, a mistake of law has not been shown in the Hearing Officer's declining to find that alleged "unilateral negligence" was the proximate cause of this injury.
>
> As the requirements of OAC 4121-3-20(E)(1)(a) or (b) have not been met, the request for a VSSR re-hearing must be denied.

{¶ 20} 12. On April 10, 2014, relator, Amanda Bent Bolt Company, filed this mandamus action.

<u>Conclusions of Law</u>:

{¶ 21} Two issues are presented:  (1) did Ohio Adm.Code 4123:1-5-11(E) plainly apprise relator that it not only had a duty to provide Youtsey with a functional pull-guard absent any defects, but also had the duty to properly adjust the pull-guard prior to Youtsey's running of the press so that his hands were prevented from reaching the danger zone during the press' operating cycle, and (2) did the commission abuse its discretion in finding that the unilateral negligence defense was not applicable to absolve relator from VSSR liability.

{¶ 22} The magistrate finds:  (1) Ohio Adm.Code 4123:1-5-11(E) did plainly apprise relator that its duty to Youtsey included the proper adjustment of the pull-guard prior to Youtsey's running the press so that his hands were prevented from reaching the danger zone during the press' operating cycle, and (2) the commission did not abuse its discretion in finding that the unilateral negligence defense was not applicable to absolve relator from VSSR liability.

{¶ 23} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

### The Safety Rule at Issue

{¶ 24} Ohio Adm.Code 4123:1-5 sets forth specific safety rules applicable to "Workshop and Factory Safety."

{¶ 25} Ohio Adm.Code 4123:1-5-11 is captioned "Forging machines, other power machines and machine tools, hydraulic and pneumatic presses, and power press brakes."

{¶ 26} Thereunder, Ohio Adm.Code 4123:1-5-11(E) is captioned "Hydraulic or pneumatic presses."

{¶ 27} Thereunder, Ohio Adm.Code 4123:1-5-11(E) provides:

> Every hydraulic or pneumatic (air-powered) press shall be constructed, or shall be guarded, to prevent the hands or fingers of the operator from entering the danger zone during the operating cycle. Acceptable methods of guarding are:
>
> * * *
>
> (4) Pull guard - attached to hands or wrists and activated by closing of press so that movement of the ram will pull the operator's hands from the danger zone during the operating cycle.

{¶ 28} The specific safety rule at issue here is the "pull-guard" method of guarding as set forth at Ohio Adm.Code 4123:1-5-11(E)(4).

{¶ 29} It can be further noted that Ohio Adm.Code 4123:1-5-01(B) sets forth at least two definitions applicable here:

> (34) "Danger zone": the point of operation where a known hazard exists.
>
> * * *

(70) "Guarded": means that the object is covered, fenced, railed, enclosed, or otherwise shielded from accidental contact.

### Basic VSSR Law

{¶ 30} It is well-settled that a VSSR award is deemed a penalty to the employer subject to the rule of strict construction with all reasonable doubts concerning the interpretation of the safety standard to be construed against the applicability of the standard to the employer. *State ex rel. Watson v. Indus. Comm.*, 29 Ohio App.3d 354 (10th Dist.1986); *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170 (1989).

{¶ 31} It is also firmly established that the determination of disputed factual situations as well as the interpretation of a specific safety requirement is within the final jurisdiction of the commission, and subject to correction in mandamus only upon a showing of an abuse of discretion. *State ex rel. Roberts v. Indus. Comm.*, 10 Ohio St.3d 1 (1984); *State ex rel. Allied Wheel Prods., Inc. v. Indus. Comm.*, 166 Ohio St. 47 (1956); *State ex rel. Volker v. Indus. Comm.*, 75 Ohio St.3d 466 (1996).

{¶ 32} Of course, the commission's authority to interpret its own safety rules is not unlimited. Strict construction does require that the commission's interpretation be reasonable. *State ex rel. Martin Painting & Coating Co. v. Indus. Comm.*, 78 Ohio St.3d 333, 342 (1997). The commission may not effectively rewrite its own safety rules when it interprets them. *State ex rel. Lamp v. J.A. Croson Co.*, 75 Ohio St.3d 77, 81 (1996).

{¶ 33} Specific safety requirements are intended to protect employees against their own negligence and folly as well as provide them a safe place to work. *State ex rel. Cotterman v. St. Marys Foundry*, 46 Ohio St.3d 42, 47 (1989).

{¶ 34} The unilateral negligence defense to VSSR liability derives from *State ex rel. Frank Brown & Sons, Inc. v. Indus. Comm.*, 37 Ohio St.3d 162 (1988), in which an employer was exonerated from VSSR liability because an employee had removed part of a scaffold that had been required by a specific safety requirement. *State ex rel. Quality Tower Serv., Inc. v. Indus. Comm.*, 88 Ohio St.3d 190, 192 (2000).

{¶ 35} However, a claimant's alleged negligence is a defense only where the employer has first complied with relevant safety requirements. *State ex rel. Hirschvogel, Inc. v. Miller,* 86 Ohio St.3d 215, 218 (1999). A claimant's negligence bars a VSSR award

only where the claimant deliberately renders an otherwise complying device noncompliant. *State ex rel. R.E.H. Co. v. Indus. Comm.,* 79 Ohio St.3d 352, 355, (1997); *Martin Painting* at 339.

## First Issue

{¶ 36} In *State ex rel. Trydle v. Indus. Comm.*, 32 Ohio St.2d 257 (1972), paragraph one of the syllabus states:

> The term, 'specific requirement,' as used in Section 35, Article II of the Constitution of Ohio, does not comprehend a general course of conduct or general duties or obligations flowing from the relation of employer and employee, but embraces such lawful, specific and definite requirements or standards of conduct as are prescribed by statute or by orders of the Industrial Commission, and which are of a character plainly to apprise an employer of his legal obligation toward his employees.

{¶ 37} In *State ex rel. Rockwell Internatl. v. Indus. Comm.*, 10th Dist. No. 79AP-720 (June 3, 1980), a case extensively discussed in the SHO's order of October 8, 2013, this court had occasion to apply *Trydle* when it determined that the commission had not abused its discretion in issuing a VSSR award.

{¶ 38} The commission had determined that the employer had failed to properly adjust the pull-back guards before the claimant began working on the press and that this failure was the direct and proximate cause of the injury. The commission in *Rockwell* addressed the rule found at former Bulletin-IC-5-08.03(D).

{¶ 39} Unlike the specific safety rule at issue here, in *Rockwell,* the rule's language stated that pull-guards shall not be used unless adjusted to keep the finger tips of the operator from the pinch point.

{¶ 40} Here, relator asserts that "[t]he 'adjustment' provisions of the old safety regulation were not incorporated into O.A.C. 4123-1-5-11(E)." (Relator's brief, 5.)

{¶ 41} Based upon that assertion and this court's decision in *Rockwell,* relator concludes that Ohio Adm.Code 4123-1-5-11(E) cannot be interpreted to require relator to correctly adjust the pull-guard prior to Youtsey's running of the press because, to do so, would violate the well-settled principle as set forth in *Trydle* that the safety rule must plainly apprise an employer of its legal obligation toward its employees. Thus, relator endeavors to place the duty to adjust the pull-guards squarely on Youtsey. As relator here

puts it, "employee Youtsey failed to ensure that the fully functional safety pull-backs on Press #400 were adjusted properly before he operated the Press * * *."  (Relator's brief, 19.)  The magistrate disagrees with relator's argument.

{¶ 42} Contrary to relator's suggestion here, that Ohio Adm.Code 4123-1-5-11(E)(4) does not contain language similar to that found at former Bulletin-IC-5-08.03(D), that specifically requires "adjustment" of the pull-guards, does not automatically compel the conclusion that Ohio Adm.Code 4123-1-5-11(E)(4) fails to require pull-guard adjustment by the employer.

{¶ 43} Again, Ohio Adm.Code 4123-1-5-11(E)(4) provides:

> Every hydraulic or pneumatic (air-powered) press shall be constructed, or shall be guarded, to prevent the hands or fingers of the operator from entering the danger zone during the operating cycle. Acceptable methods of guarding are:
>
> * * *
>
> (4) Pull guard - attached to hands or wrists and activated by closing of press so that movement of the ram will pull the operator's hands from the danger zone during the operating cycle.

{¶ 44} In the magistrate's view, employer adjusted pull-guards are mandated when the safety rule at issue states that every hydraulic or pneumatic press "*shall* be guarded to prevent the hands or fingers of the operator from entering the danger zone during the operating cycle" and when the rule further states that "movement of the ram will pull the operator's hands from the danger zone during the operating cycle." (Emphasis added.) That the word "adjustment" is absent from Ohio Adm.Code 4123-1-5-11(E)(4) is of no consequence.  The rule at issue plainly apprises the employer that the pull-guards provided by the employer shall be guarded in a manner that will pull the operator's hands from the danger zone during the operating cycle.

{¶ 45} Based on the above analysis, the magistrate concludes that the SHO's order of October 8, 2013 does not misapply the *Rockwell* case.  Moreover, contrary to relator's position here, Ohio Adm.Code 4123-1-5-11(E)(4) did plainly apprise relator that it had the duty to properly adjust the pull-guard prior to Youtsey's running of the press.

### Second Issue

{¶ 46} As earlier noted, the second issue is whether the commission abused its discretion in finding that the unilateral negligence defense was not applicable to absolve relator from VSSR liability.

{¶ 47} Relator's argument for the unilateral negligence defense is undermined by its failure to recognize that Ohio Adm.Code 4123:1-5-11(E) placed a duty on relator to properly adjust the pull-guard prior to Youtsey's running of the press. Thus, relator refuses to take responsibility for Hurst's undisputed failure to properly adjust the pull-guard.

{¶ 48} To reiterate the key VSSR principle involved here, a claimant's alleged negligence is a defense only where the employer has first complied with relevant safety requirements. *Hirschvogel.* A claimant's negligence bars a VSSR award only where the claimant deliberately renders an otherwise complying device non-compliant. *R.E.H.*

{¶ 49} It is largely undisputed that Hurst, an Amanda employee assigned by Amanda to perform the safety setup, failed to properly adjust the pull-guard prior to Youtsey's running of the press. In fact, Amanda disciplined Hurst for his failure to properly adjust Youtsey's safeties.

{¶ 50} Because the pull-guard was never properly adjusted prior to Youtsey's running of the press, relator cannot argue here that it complied with the safety rule at issue. That is, while the pull-guard itself was not defective, it was never made effective as a guard due to the failure of Hurst to properly adjust the pull-guard.

{¶ 51} Given the above analysis, all of relator's endeavors to show negligence on the part of Youtsey are indeed inconsequential. Even if it can be said that Youtsey was negligent by his failure to report his concern to his supervisor Mr. Losey, the negligence does not bar a VSSR award.

{¶ 52} In short, the commission did not abuse its discretion when it rejected relator's unilateral negligence defense.

{¶ 53} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).