THE STATE EX REL. AT & T, INC., APPELLANT, *v.* McGRAW ET AL., APPELLEES.

[Cite as *State ex rel. AT & T, Inc. v. McGraw,*
120 Ohio St.3d 1, 2008-Ohio-5246.]

(No. 2007–1646—Submitted August 26, 2008—Decided October 15, 2008.)

**Per Curiam.**

{¶ 1} Appellee David McGraw, now 78 years old, was declared permanently and totally disabled in 1986. Recognized by his rural community as an expert in muzzle-loading firearms, McGraw and his wife, Mary, have been muzzle-loading enthusiasts for decades, and much of their social life revolves around these activities. We must determine whether his involvement with Stumptown Muzzle-loading Supplies ("SMS") after he was declared to be permanently and totally disabled warrants the termination of those benefits and a declaration of overpayment and fraud.

{¶ 2} SMS began in the mid–1980s when Mary was approached by a neighbor with the idea of building a shooting range on some of their adjoining land. In 1990, the McGraws' garage was converted into a small machine shop with a counter/service area in front. The machines were owned first by Gary Parsons and later by Keith Phillips, who succeeded Parsons as SMS's gunsmith.

{¶ 3} SMS was originally a three-person partnership of Mary McGraw, Gary Parsons, and Alan Shepherd. Ill health and travel distance eventually caused Parsons and Shepherd to leave the partnership, and by 1997, Mary was sole proprietor of SMS.

{¶ 4} All of the business, ammunition, and firearms licenses (and accounts) were in Mary's name. McGraw and Mary were listed as "responsible persons" for the Bureau of Alcohol, Tobacco, Firearms, and Explosives, meaning they had "the power to direct the management and policies of the applicant pertaining to explosive materials." Mary testified that her husband's designation was technical and was confined to the handling of black powder.

{¶ 5} SMS did not advertise and did not have a phone. There was only a sign outside with the SMS name and McGraw's nickname, which was included because of his local name recognition. Hours were posted on the door in compliance with federal firearms-licensing requirements.

{¶ 6} Gary Parsons stated that McGraw "tinkered around" in the shop a lot. McGraw confirmed that he enjoyed being in the shop most days because he "could talk to the guys that come in. Friends would come in." There is no evidence that McGraw did any machine work or gunsmithing. Parsons stated that Parsons did most of the work involving the building of muzzle-loaders. Phillips eventually took over those duties when Parsons left. Additional testimony revealed that McGraw, who was renowned for making muzzle-loaders, including the parts, by hand, did not know how to make them by machine. Moreover, he has end-stage glaucoma in both eyes and has been legally blind since 1998.

{¶ 7} Bureau investigators posing as gun enthusiasts twice visited SMS. These visits consisted primarily of small talk about guns and ammo. McGraw discussed some pistols that he had recently sold and invited one of the investigators to bring in an allegedly defective gun, telling them he would "take a look at it." He also sold a small item to the investigators on each occasion.

{¶ 8} Financially, investigation revealed that the SMS bank account listed Mary as sole proprietor. Bank records did not show any transfer from the business account to the McGraws' personal account, and there were no checks written from the business account to McGraw.

{¶ 9} Appellant, AT & T, Inc., the amenable employer in this case, filed a motion for termination of compensation and declarations of fraud and overpayment with appellee Industrial Commission of Ohio. Before a staff hearing officer, AT & T argued that McGraw's activities were incompatible with his receipt of permanent total disability compensation. The staff hearing officer was not persuaded. In a lengthy order, the hearing officer found that McGraw's activities were neither remunerated nor inconsistent with his physical restrictions. The staff hearing officer was ultimately persuaded by "claimant's assertion that he was merely keeping busy with permitted sedentary activity related to a hobby he has had for over 50 years" and concluded that McGraw "was *not* engaged in *nor* capable of sustained remunerative employment from 05/02/1997 to date." (Emphasis sic.) Reconsideration was denied.

{¶ 10} AT & T filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission had abused its discretion in failing to terminate permanent total disability compensation and declare overpayment and fraud. AT & T argued that if McGraw could interact with customers for free as a hobby, he could do so for pay, and was thus capable of sustained remunerative employment. The court of appeals disagreed, holding that there was no

evidence that McGraw was capable of engaging in the disputed activities on a *sustained* basis. The writ was accordingly denied. *State ex rel. AT & T, Inc. v. McGraw,* Franklin App. No. 06AP–1103, 2007-Ohio-3794, 2007 WL 2153210.

{¶ 11} This cause is now before this court on appeal as of right.

{¶ 12} Permanent total disability compensation cannot be paid to a claimant who is (1) engaged in sustained remunerative employment, (2) medically able to engage in sustained remunerative employment, or (3) engaged in activities so medically inconsistent with the purported disability as to impeach the medical evidence underlying the award. *State ex rel. Lawson v. Mondie Forge,* 104 Ohio St.3d 39, 2004-Ohio-6086, 817 N.E.2d 880, ¶ 16. AT & T does not allege that McGraw was paid for his activities, nor does it allege that those activities are medically incompatible with the claimed disability. It instead relies on *Lawson's* second criterion and argues that if McGraw can perform these activities as a volunteer, he is medically capable of doing them for pay. This activity, according to AT & T, demonstrates a medical capacity for sustained remunerative employment that should bar permanent total disability compensation.

{¶ 13} Two responses have been offered. The first is that McGraw's activities do not constitute work. The second is that even if they do, there is no evidence that McGraw can do them on a sustained basis. The commission relied on the former, the court of appeals on the latter, and both have merit.

{¶ 14} Addressing the commission's position first, two cases are particularly meaningful. *Lawson* was also a case involving the termination of permanent total disability compensation and involved a claimant who had performed civic, but largely sedentary, activities in connection with his position as a village councilman. The bureau learned of this situation in the claimant's small community and succeeded in having permanent total disability compensation stopped.

{¶ 15} In reinstating compensation, we addressed the mentality that seemed to underlie the commission's termination order:

{¶ 16} "One of the most enduring (though not often explicitly stated) misconceptions about PTD is that once it is granted, the recipient must thereafter remain virtually housebound. This is a fallacy. PTD exempts no one from life's daily demands. Groceries must be purchased and meals cooked. Errands must be run and appointments kept. The yard must be tended and the dog walked. Where children are involved, there may be significant chauffeur time. For some, family and friends shoulder much of the burden. Others, on the other hand, lack such support, leaving the onus of these chores on the PTD claimant.

{¶ 17} "These simple activities can nevertheless often generate considerable controversy. That is because all of these tasks are potentially remunerative. From the school cafeteria to the four-star restaurant, people are paid to prepare

4

meals.  People are paid for lawn and child care.  Many people earn their living behind the wheel.  *State ex rel. Parma Comm. Gen. Hosp. v. Jankowski,* 95 Ohio St.3d 340, 2002-Ohio-2336, 767 N.E.2d 1143, acknowledged this and cautioned against an automatic disqualification from compensation based on the performance of routine tasks, regardless of their potential for payment." *Lawson,* 104 Ohio St.3d 39, 2004-Ohio-6086, 817 N.E.2d 880, ¶ 20–21.

{¶ 18} Many of McGraw's observed activities fit this description.  People are paid to talk, to share expertise, opinion, and advice, and to interact with others, but these activities are also integral to everyday life.  They should, therefore, be thoughtfully considered and should not automatically disqualify McGraw from permanent total disability compensation.

{¶ 19} The second case of note is *State ex rel. Honda of Am. Mfg. Co. v. Indus. Comm.,* 113 Ohio St.3d 5, 2007-Ohio-969, 862 N.E.2d 478.  In that case, Edith Anderson, a recipient of temporary total disability compensation, opened a small scrapbooking shop with proceeds from her late husband's life insurance policy.  Id. at ¶ 1.  The store was staffed by others, but Anderson, a scrapbooking hobbyist, occasionally visited the store to chat.  Id. at ¶ 2.  Just as did McGraw, Anderson eventually came under investigation.  She was twice approached in the store by undercover investigators posing as customers.  Id. at ¶ 4.  Anderson answered scrapbooking questions, suggested Mother's Day gifts, and described classes offered by the store.  Id.  Based on this evidence, Honda sought to terminate temporary total disability compensation, alleging that Anderson's activities constituted work.  Id. at ¶ 15.  The commission denied the motion after finding no evidence that Anderson was paid or that her activities were inconsistent with her alleged disability.  Id. at ¶ 16.

{¶ 20} We upheld that order.  We stressed that Anderson's "mere presence at the store is not itself disqualifying."  *Honda,* 113 Ohio St.3d 5, 2007-Ohio-969, 862 N.E.2d 478, ¶ 28.  We also found that the activities were insignificant, both in number and character:

{¶ 21} "[O]ver a three-month period, Anderson was viewed just five times.  On three of those occasions, she assisted no customers.  On the other two, she apparently helped a single customer by answering questions and pointing out displays and once used a cash register for an unknown purpose.  This was the sum total of her observed activities at My Crop Shop."  Id. at ¶ 27.

{¶ 22} Our final comments on Anderson's activities, very similar to McGraw's, are instructive:

{¶ 23} "The commission found that Anderson's activities—to the extent that they generated any income at all—did so only secondarily because they were geared more towards promoting the goodwill of the business.  We again defer to that finding.  Most of the disputed activities consisted of answering customer

questions. Certainly, Anderson cannot be required to ignore customer inquiries in order to maintain eligibility for compensation. That would indeed destroy the business's goodwill. As to the operation of the cash register, it occurred just once, without any evidence that it was connected to a sale, and does not justify termination of Anderson's temporary total disability compensation." Id. at ¶ 29.

{¶ 24} Unlike the instant case, *Honda* involved temporary total, rather than permanent total, disability. Despite distinctions between the two, one common feature is the applicable definition of "work." Both temporary total disability compensation and permanent total disability compensation define it as labor exchanged for pay, *Lawson*, 104 Ohio St.3d 39, 2004-Ohio-6086, 817 N.E.2d 880, at ¶ 19, which makes *Honda* instructive here. Anderson's activities were very similar to McGraw's, and because the former's activities did not constitute work, we are not convinced that McGraw's performance of comparable activities demonstrates a capacity for work.

{¶ 25} In summary, there are three important points to consider from these two decisions. *Lawson* teaches that tasks that potentially fall into the category of "routine life activities" will be thoughtfully considered and will not easily be deemed to preclude permanent total disability. *Honda* undermines AT & T's suggestions that McGraw's mere presence in the store is inherently suspect and that his interactions with investigators constituted work.

{¶ 26} *Honda* and *Lawson* illustrate a second point—the importance of the commission's exclusive ability to evaluate evidentiary weight and credibility. Much of the evidence submitted to terminate the disability compensation in these cases was derived from surveillance. Surveillance evidence can be challenging to evaluate because the cost of obtaining it means it is generally limited to a few days of observation. Consequently, resolution often depends on inference: does the evidence suggest a pattern of regular activity or does it imply an isolated occurrence?

{¶ 27} The commission is in the best position to address this question because it alone has observed the demeanor and heard the testimony of the claimant, investigators, and other witnesses. In the present case, the commission considered the documentary evidence and heard testimony from the McGraws and others. At the conclusion of the hearing, the commission determined that David McGraw's activities were consistent with a hobby, not a job, and did not bar permanent total disability compensation. We defer to that finding.

{¶ 28} The court of appeals affirmed the commission on a slightly different basis, in effect holding that regardless of the character of the activities, there was no evidence that McGraw could do them on a sustained basis. In *Lawson*, that same finding was an important element of our reinstatement of compensation for

permanent total disability, and we agree that it also supports the commission's order.

{¶ 29} The commission's order is well reasoned and is supported by evidence. The court of appeals upheld that order, and we affirm its judgment.

Judgment affirmed.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

————————

Porter, Wright, Morris & Arthur, L.L.P., Darrell R. Shepard, and Kathryn L. Krisher, for appellant.

Butler, Cincione & DiCuccio and Matthew P. Cincione, for appellee David McGraw.

Nancy Hardin Rogers, Attorney General, and Stephen D. Plymale, Assistant Attorney General, for appellee Industrial Commission.