[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Seibert v. Richard Cyr, Inc.,* Slip Opinion No. 2019-Ohio-3341.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-3341

THE STATE EX REL. SEIBERT, APPELLANT, *v.* RICHARD CYR, INC., ET AL.;

INDUSTRIAL COMMISSION OF OHIO, APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Seibert v. Richard Cyr, Inc.,* Slip Opinion No. 2019-Ohio-3341.]

*Workers' compensation—Permanent-total-disability ("PTD") compensation— Some evidence supports Industrial Commission's determination that claimant engaged in sustained remunerative employment by participating in bartering relationship for reductions of his stall-rental and feed fees while receiving PTD compensation—Commission abused its discretion in choosing March 26, 2009, as date of termination of claimant's PTD compensation—Some evidence supports commission's findings that claimant falsely represented that he was not working and that he made false representations knowingly—Court of appeals' judgment affirmed in part and reversed in part, and limited writ of mandamus issued directing commission to determine appropriate date of termination of claimant's PTD compensation.*

(No. 2017-0185—Submitted February 19, 2019—Decided August 22, 2019.)

APPEAL from the Court of Appeals for Franklin County, No. 15AP-402,

2016-Ohio-8335.

———————————

**FRENCH, J.**

{¶ 1} Appellant, Kenneth J. Seibert, appeals the judgment of the Tenth District Court of Appeals denying his request for a writ of mandamus ordering appellee, Industrial Commission, to vacate its order that (1) terminated his permanent-total-disability ("PTD") compensation, (2) determined that he had been overpaid PTD compensation, and (3) found that he had committed fraud while receiving PTD compensation. In denying Seibert's request, the court of appeals determined that there was some evidence to support the commission's finding that he was engaged in sustained remunerative employment through various horse-training and horse-grooming activities that he was performing at a raceway while receiving PTD compensation. It also determined that there was some evidence to support the commission's finding that he had committed fraud by concealing these activities.

{¶ 2} Seibert makes four arguments on appeal: (1) that his raceway activities do not constitute work, (2) that even if the activities could be construed as work, he was not working as of the effective date of the commission's termination of his benefits, (3) that the commission did not identify the evidence it relied on to reach its decision, and (4) that he did not commit fraud. For the following reasons, we affirm in part and reverse in part the court of appeals' judgment.

**FACTS AND PROCEDURAL BACKGROUND**

*Seibert's PTD award*

{¶ 3} In 1990 and 1991, Seibert sustained workplace injuries; his ensuing workers' compensation claims were allowed for various back and psychological

conditions. In a 2007 order, the commission awarded Seibert PTD compensation, effective in 2006. In granting the award, the commission found that Seibert was incapable of performing any sustained remunerative employment. The commission specified that Seibert's compensation was to "continue without interruption unless or until future facts and circumstances justify the stopping of the award."

*The SID investigation*

{¶ 4} In 2013, the Special Investigations Department ("SID") of the Bureau of Workers' Compensation initiated an investigation into Seibert after determining that he "had an active groomer/owner license with the Ohio State Racing Commission" while receiving PTD compensation. The SID later determined that Seibert held a "groom/owner" license for 2008 and an owner license for 2009, 2010, 2011, 2012, and 2013.

{¶ 5} From April to June 2014, the SID conducted surveillance of Seibert at Lebanon Raceway. SID agents witnessed him jogging horses around the track, wearing riding attire and a helmet, hosing off a horse, maneuvering a sulky (a two-wheeled horse cart) and removing it from a horse, hauling a horse trailer with his truck, pushing a wheelbarrow and dumping its contents, and walking a horse to a shower stall.

{¶ 6} In June 2014, SID agents interviewed Seibert at barn 11 of the raceway. Seibert was washing a horse when the agents arrived. Seibert told the agents that he had "worked/trained" at the raceway for the past four to five years and that he currently owned two horses. Seibert stated that he kept his horses in stalls rented from Jim Davis and that Davis sometimes waived his rental and feed fees in exchange for Seibert's running, bathing, and feeding Davis's horses. Seibert said he had performed similar services for Brent Hopper, who also kept horses in barn 11. On a typical day at the raceway, Seibert would run each of his horses, as well as two or three other horses belonging to Davis or Hopper, for three miles

around the track. Seibert told the agents he is physically able to work with horses and wanted to pursue it as a career.

{¶ 7} SID agents also interviewed several other individuals about Seibert's activities. Davis, who rented barn 11 and stabled 12 horses there, knew Seibert from Seibert's "hanging around" the barns for as long as Davis could remember. In his June 2014 interview, Davis stated that Seibert "came around his barn last year and helped for a short time but then was 'missing' for about six months and returned in February 2014." Davis stated that in March 2014, he gave Seibert a one-half ownership interest in a horse named Edna Lou, which Davis valued at $500. Davis stated that he had not been paying Seibert for working at the barn, because Seibert owed him for Seibert's part of Edna Lou's upkeep. Edna Lou had raced ten times in 2014, earning almost $2,000. Davis and Seibert split these winnings evenly after giving 5 percent to the driver and 5 percent to the trainer. It appears, however, that Davis ultimately retained Seibert's share of the winnings because of the continued cost of maintaining Edna Lou. Davis stated that Seibert had previously owned other horses, which he housed in other barns.

{¶ 8} According to Davis, Seibert was working at the raceway three to five days a week, usually arriving between 10 and 10:30 a.m. and working until between 1:30 and 2 p.m. He stated that Seibert harnessed and attached horses to a sulky and jogged, hosed off, and fed them. If Seibert had not been doing this work, Davis would have been paying someone approximately $100 to $125 a week to perform it.

{¶ 9} Hopper told SID agents that he had stabled his horses with Davis in barn 11 for about two years and that Seibert, whom he had known for only about a year, had been helping out in barn 11 by jogging the horses, cleaning their stalls, and spraying them down. Hopper said he had been paying Davis a monthly rental fee for boarding, feeding, and exercising his horses. In his signed statement, Hopper stated, "If Ken Seibert gets paid for anything he does at the barn, I do not

know about that or how he was paid." While agents were interviewing Hopper, Seibert approached him and asked what other work was left to be done. Seibert then removed a harness from a horse, led it into a stall, and sprayed it down. Hopper told one agent that earlier in 2014, he had paid Seibert $500 from the proceeds of a horse he sold as thanks for helping out around the barn "last year and years prior."

{¶ 10} Doug Stovall, who stabled one horse in barn 6, told agents that Seibert did not work for anyone at the raceway but that Seibert sometimes came around to "hang out and talk" or to ride horses. When an agent presented to Stovall a copy of a $25 check that Stovall had made out to Seibert in 2010, Stovall stated that it might have been to pay Seibert for retrieving a trailer. But Stovall otherwise denied that Seibert performed any work, including training or exercising his horse, for him.

{¶ 11} Stacey Nisonger, who kept one or more horses in barn 14, told agents that Seibert had "sporadic[ally]" and "not very often" helped her out by cleaning stalls and harnessing and jogging horses but that Seibert was no longer working for her. Nisonger did not offer any details of when Seibert had performed work for her, but she did state that in 2013, she had twice paid $40 to Seibert for transporting horses to races.

{¶ 12} Dr. Dennis Ward, who had been treating Seibert while Seibert was receiving PTD compensation, told agents that he did not know that Seibert had been working at the raceway while receiving treatment and that he felt deceived by Seibert. Dr. Ward nevertheless opined that Seibert was permanently disabled.

*Commission proceedings*

{¶ 13} In September 2014, the bureau filed a motion with the commission requesting that it (1) terminate Seibert's PTD compensation effective March 26, 2009, (2) declare as overpaid all PTD compensation paid to Seibert as of March 26, 2009, and (3) declare that Seibert had committed fraud by concealing his employment while receiving PTD compensation.

{¶ 14} In January 2015, a staff hearing officer ("SHO") held a hearing for the commission at which Seibert and an SID agent testified. Following the hearing, the SHO issued a decision granting the bureau's motion. The SHO found that a bartering system existed between Davis and Seibert, in which Seibert was performing work in exchange for horse-stall rentals and horse feed, and that Seibert engaged in sustained, remunerative employment while helping with the horses in Davis's barn. The SHO found that Seibert had been engaged in sustained remunerative employment since March 26, 2009, the date when he received a $350 check from Lebanon Trotting Club, Inc., as prize earnings for a horse he had owned. The SHO also found that Seibert had engaged in civil fraud by concealing the fact that he was working at the raceway while receiving PTD compensation.

*Court-of-appeals proceedings*

{¶ 15} Seibert filed an original action in the Tenth District Court of Appeals for a writ of mandamus ordering the commission to vacate its decision. The court of appeals referred the action to a magistrate, who recommended that the writ be granted in part. The magistrate concluded that the commission did not abuse its discretion in finding that Seibert had been engaged in sustained remunerative employment since March 26, 2009. But the magistrate concluded that the record did not support the commission's finding of fraud.

{¶ 16} Both parties filed objections to the magistrate's decision, with Seibert objecting to the conclusion that he was engaged in sustained remunerative employment beginning March 26, 2009, and the commission raising two objections challenging the conclusion that Seibert had not committed fraud. The court of appeals rejected Seibert's objection, finding that there was "some evidence" to support the commission's determination that Seibert engaged in sustained-remunerative-employment as of March 26, 2009. 2016-Ohio-8335, ¶ 12. But the court of appeals sustained the commission's objections, finding that there was

"some evidence" to support the commission's fraud finding. *Id.* at ¶ 19. Seibert then filed this appeal.

## ANALYSIS

### *The mandamus standard*

{¶ 17} For a writ of mandamus to issue, the relator must demonstrate a clear legal right to the relief sought and a clear legal duty on the respondent's part to provide that relief. *State ex rel. AutoZone, Inc. v. Indus. Comm.*, 117 Ohio St.3d 186, 2018-Ohio-541, 883 N.E.2d 372, ¶ 14. To demonstrate a clear legal right, the relator must "demonstrate that the commission abused its discretion by entering an order not supported by some evidence in the record." *State ex rel. McKee v. Union Metal Corp.*, 150 Ohio St.3d 223, 2017-Ohio-5541, 80 N.E.3d 491, ¶ 11. "Where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus will not lie." *State ex rel. Kroger Co. v. Stover*, 31 Ohio St.3d 229, 232, 510 N.E.2d 356 (1987).

### *The commission's sustained-remunerative-employment finding*

{¶ 18} Payment of PTD compensation is inappropriate when there is evidence of (1) actual sustained remunerative employment, (2) the physical ability to do sustained remunerative employment or (3) activities so medically inconsistent with the disability that they impeach the medical evidence underlying the award. *State ex rel. Lawson v. Mondie Forge*, 104 Ohio St.3d 39, 2004-Ohio-6086, 817 N.E.2d 880, ¶ 16 (collecting cases). The issue in this case concerns the first situation, namely, whether some evidence exists to support the commission's finding that Seibert had been engaged in sustained remunerative employment.[1]

---

1. Although the commission and the court of appeals addressed only the first situation, the commission now argues that all three situations apply. Because "justice is far better served when [this court] has the benefit of briefing, arguing, and lower court consideration before making a final determination," *Sizemore v. Smith*, 6 Ohio St.3d 330, 333, 453 N.E.2d 632 (1983), fn. 2, we do not address the second and third situations.

**{¶ 19}** Seibert does not contest that he has engaged in the activities the SID agents observed at the raceway. Instead, he argues that the commission applied the wrong standard in evaluating the legal significance of those activities. He argues that owning and caring for horses are permissible because they do not rise to the level of gainful work activity. According to Seibert, a contrary ruling would foreclose PTD compensation to anyone who generates passive income from an asset and performs incidental activities to enhance the asset's value.

**{¶ 20}** "Permanent total disability is the inability to do *any* sustained remunerative work." (Emphasis sic.) *State ex rel. Schultz v. Indus. Comm.*, 96 Ohio St.3d 27, 2002-Ohio-3316, 770 N.E.2d 576, ¶ 61. "Work" generally means labor exchanged for pay. *Lawson* at ¶ 19. Remuneration can take the form of a cash payment or a cash-like benefit. *See State ex rel. Alesci v. Indus. Comm.*, 97 Ohio St.3d 210, 2002-Ohio-5932, 777 N.E.2d 835, ¶ 20. "Work is 'sustained' if it consists of an ongoing pattern of activity." *State ex rel. Bonnlander v. Hamon*, 150 Ohio St.3d 567, 2017-Ohio-4003, 84 N.E.3d 1004, ¶ 15. "[W]ork need not be regular or daily" to qualify as sustained. *Id.* "[I]ntermittent and occasional" or "part-time" work may qualify. *Id.*

**{¶ 21}** The commission found that Seibert was engaged in a bartering system by washing, harnessing, jogging, and feeding others' horses in exchange for a reduction of his stall-rental and feed fees for the two horses he owned. Although cash payments were not being made, that system nevertheless qualifies as remunerative under *Alesci*. In that case, a PTD claimant had been authorized all-expense-paid travel in exchange for work performed. Notwithstanding the absence of cash payments, this court held that the travel benefit was remunerative. *Id.* at ¶ 20. Seibert's monthly fee reductions have a similar character because they provide cash-like benefits. As Davis stated, if Seibert had not been performing the raceway activities, Davis would have been required to pay someone else to perform them.

And Seibert likewise testified that the activities he was performing were tasks that a person would normally be paid to do.

{¶ 22} Seibert's testimony also bears out the commission's finding that his raceway activities were sustained. On non-race days, he typically worked Monday to Saturday for two to three hours. On race days, which occurred once a week, he worked from 9 a.m. to 3:30 p.m. Because this schedule constitutes "an ongoing pattern of activity," Seibert's activities were sustained. *Bonnlander* at ¶ 15.

{¶ 23} To support his contention that he was not working at the raceway, Seibert relies on *State ex rel. Ford Motor Co. v. Indus. Comm.*, 98 Ohio St.3d 20, 2002-Ohio-7038, 780 N.E.2d 1016, and *State ex rel. Honda of Am. Mfg. Co. v. Indus. Comm.*, 113 Ohio St.3d 5, 2007-Ohio-969, 862 N.E.2d 478. Although both cases involved temporary-total-disability ("TTD") compensation rather than PTD compensation, that distinction is immaterial for the purpose of determining whether Seibert was engaged in work. *See State ex rel. AT&T, Inc. v. McGraw*, 120 Ohio St.3d 1, 2008-Ohio-5246, 895 N.E.2d 842, ¶ 24 ("Despite distinctions between [TTD and PTD], one common feature is the applicable definition of 'work' ").

{¶ 24} In *Ford*, the claimant had performed various tasks for his lawn-care business while also receiving TTD compensation. This court rejected the argument that the claimant was working, because the "activities did not, in and of themselves, generate income; claimant's activities produced money only secondarily, e.g., claimant signed the paychecks that kept *his employees* doing the tasks that generated income." (Emphasis sic.) *Id.* at ¶ 23. We cautioned that this rationale should be considered on a case-by-case basis and applied only when the activities in question are minimal, noting that "[a] claimant should not be able to erect a facade of third-party labor to hide the fact that he or she is working." *Id.* at ¶ 24.

{¶ 25} *Ford* is distinguishable. Unlike that case's claimant, whose activities did not generate income, Seibert's raceway activities generated a cash-like benefit in the form of fee reductions. Further, Seibert's activities are not

minimal. As noted above, he typically performed laborious activities Monday to Saturday for two to three hours a day and on race days he worked even longer.

{¶ 26} In *Honda*, 113 Ohio St.3d 5, 2007-Ohio-969, 862 N.E.2d 478, the claimant was observed performing tasks at her scrapbooking store while she was receiving TTD compensation. Guided by *Ford*'s logic, this court concluded that the commission correctly refused to terminate her TTD compensation. First, the activities the claimant had performed at her store were minimal. And second, most of the activities consisted of answering customer questions, which generated income, if at all, only secondarily and was "geared more towards promoting the goodwill of the business." *Honda* at ¶ 29.

{¶ 27} *Honda* is distinguishable for many of the same reasons that *Ford* is. Seibert's raceway activities are not minimal, and he did not perform them to generate income secondarily or to promote goodwill; he performed them to achieve a cash-like benefit in the form of monthly fee reductions.

{¶ 28} In summary, we conclude that there is some evidence to support the commission's determination that Seibert engaged in sustained remunerative employment by participating in a bartering relationship for reductions of his stall-rental and feed fees while receiving PTD compensation.

*The commission's date of termination of Seibert's PTD compensation*

{¶ 29} Seibert next argues that the commission misevaluated the evidence in deciding to terminate his receipt of PTD compensation as of March 26, 2009. He argues that there is no direct evidence establishing that he was performing bartering activities as of that date. He maintains that bartering did not commence until February 2014 if at all. The commission does not contest Seibert's assertion that no direct evidence shows him engaged in a bartering relationship as of March 26, 2009. At the hearing, the bureau's attorney explained, "We use the date of March 26th of 2009, that was the date that he received a purse from the Lebanon Trotting Club. And, because of the little bit different exchange of money or

services in this case, it's not a typical situation where we have an exact date of work done and payment made, but that's the date that we use." But the commission argues that the evidence *suggests* that Seibert was performing similar bartering activities as of March 26, 2009, and that a finder of fact could *infer* that he was doing so.

{¶ 30} A challenge to the commission's evaluation of the evidence is subject to well-established principles. "The commission is exclusively responsible for assessing the weight and credibility of evidence." *State ex rel. George v. Indus. Comm.*, 130 Ohio St.3d 405, 2011-Ohio-6036, 958 N.E.2d 948, ¶ 11. We generally defer to the commission's expertise in evidentiary matters and do not substitute our judgment for the commission's. *State ex rel. Perez v. Indus. Comm.*, 147 Ohio St.3d 383, 2016-Ohio-5084, 66 N.E.3d 699, ¶ 20. The commission "has substantial leeway in both interpreting and drawing inferences from the evidence before it," but that latitude is not unlimited. *Lawson*, 104 Ohio St.3d 39, 2004-Ohio-6086, 817 N.E.2d 880, at ¶ 34. Our function is to discern "whether there is some evidence in the record to support the commission's decision," not to "second-guess the commission's evaluation of the evidence." *State ex rel. Black v. Indus. Comm.*, 137 Ohio St.3d 75, 2013-Ohio-4550, 997 N.E.2d 536, ¶ 22.

{¶ 31} In support of the finding that Seibert returned to work as of March 26, 2009, the SHO found that Seibert received on that date a $350 purse check from the Lebanon Trotting Club for a horse he had owned. That is the only evidence in the record specifically related to March 26, 2009. In addition, the commission quoted Seibert's June 2014 statement to SID agents that he had been involved in the business of training and racing horses since the late 1980s and had known Davis since that time. The commission also quoted Davis's statement to the SID agents that Seibert had been around the barns at the raceway since Davis could remember. But neither Seibert's ownership of a horse and receipt of prize earnings associated with the ownership of that horse nor the quoted statements permit an inference that

Seibert was engaged in sustained remunerative employment at the Lebanon Raceway.

{¶ 32} As we have already concluded, Davis's statement to the SID agents constitutes some evidence that a bartering relationship existed between Seibert and Davis. But Davis's statement provides no evidence that Seibert worked, either for money or as part of a bartering relationship, for Davis prior to 2013. With respect to Seibert's work for him, Davis reported in June 2014 that Seibert "came around his barn last year and helped for a short time but then was 'missing' for about six months and returned in February 2014." Davis explained that Seibert completed chores around the barn "to work off the cost of the horse," which Seibert did not take an ownership interest in until March 2014. Davis thought that Seibert may have helped in other barns previously, but he was unable to offer any details or to otherwise confirm that belief. In short, Davis did not identify any work that Seibert performed prior to 2013, and his statements do not provide a basis for inferring that Seibert engaged in sustained remunerative employment before 2013, when Seibert "came around his barn * * * and helped for a short time."

{¶ 33} Seibert told the SID agents that he had been "involved in the horse training/racing business since the late 1980s" and that he had "worked/trained" at the raceway for four to five years prior to June 2014. But like Davis's statements, Seibert's statements do not constitute evidence from which a trier of fact could conclude that Seibert engaged in sustained remunerative employment at the raceway since March 26, 2009. Seibert expressly denied that he had a bartering relationship with Davis since 2009, and he estimated that he had rented stall space from Davis only since 2011 or 2012. The only evidence of a bartering arrangement—the sole basis upon which the commission found that Seibert had been engaged in sustained remunerative employment—related to Seibert's activities in barn 11 during 2013 and 2014. There is no evidence that Seibert engaged in a bartering relationship with anyone else. And there is no evidence that

Seibert performed any sustained or remunerative work prior to his work in barn 11. Only through speculation may Seibert's statements of "involve[ment] in the horse training/racing business since the late 1980s" and that he had "worked/trained" at the raceway for four to five years be construed as evidence that he had engaged in sustained remunerative employment at the raceway prior to 2013.

**{¶ 34}** Although this court does not second-guess the commission's evidentiary findings, there is simply no evidence in the record from which the commission could reasonably infer that Siebert provided labor in exchange for a cash payment or a cash-like benefit as of March 26, 2009, or indeed prior to 2013. *See Lawson*, 104 Ohio St.3d 39, 2004-Ohio-6086, 817 N.E.2d 880, at ¶ 19; *Alesci*, 97 Ohio St.3d 210, 2002-Ohio-5932, 777 N.E.2d 835, at ¶ 20. We therefore conclude that the commission abused its discretion in choosing March 26, 2009, as the date of termination of Seibert's PTD compensation.

**{¶ 35}** Having determined that the commission abused its discretion in terminating Seibert's PTD compensation as of March 26, 2009, we need not address Seibert's argument that the commission did not identify the evidence that it relied on to support its termination of his PTD compensation as of that date.

*The commission's fraud finding*

**{¶ 36}** Seibert's last argument challenges the commission's finding that he committed fraud. Fraud has six elements, all of which must be met:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the

representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Gaines v. Preterm-Cleveland, Inc.*, 33 Ohio St.3d 54, 55, 514 N.E.2d 709 (1987); *see also State ex rel. Sachdeva v. Indus. Comm.*, 102 Ohio St.3d 178, 2004-Ohio-2264, 807 N.E.2d 924, ¶ 9 (applying *Gaines* in reviewing a finding by the commission that a claimant had committed fraud).

{¶ 37} In its decision, the commission offered six reasons to justify its finding of fraud. First, Seibert had received from the bureau correspondence informing him that he was not permitted to work, yet he had concealed his work activity while receiving PTD compensation. Second, Seibert's concealment enabled him to receive benefits to which he was not otherwise entitled. Third, but for Seibert's concealment, the bureau would not have paid him. Fourth, Seibert failed to notify the bureau that he was working. Fifth, the bureau justifiably relied on his representation that he was not working. And sixth, the bureau suffered injury by paying Seibert PTD compensation.

{¶ 38} Seibert argues that he lacked the requisite intent to commit fraud because he was unaware that his raceway activities constituted work. In support, he relies on *State ex rel. McBee v. Indus. Comm.*, 132 Ohio St.3d 209, 2012-Ohio-2678, 970 N.E.2d 937. In that case, the claimant had received TTD compensation while performing unpaid activities for his wife's business. During that time, the claimant had received correspondence informing him that work was not permitted while receiving TTD compensation. The correspondence did not, however, define work or explain that unpaid activities could constitute work. In addressing the commission's finding that the claimant had committed fraud, this court considered whether he had knowingly misrepresented a material fact when he submitted to the bureau documents certifying that he was not working. Although we recognized that unpaid activities could sometimes qualify as work, we found this principle

neither "intuitive, nor * * * within the realm of the average claimant's experience." *Id.* at ¶ 10. We also found nothing in the record from which an inference could be drawn to establish that the claimant knew that what he was doing could be construed as work. Without evidence to show that the claimant had knowingly misled the commission or the bureau, we held that no evidence supported the commission's fraud finding.

{¶ 39} In contrast to *McBee*, this case does not involve a claimant who performed unpaid activities. Although Seibert's bartering activities did not generate cash payments, they were nevertheless remunerative because they entitled him to a cash-like benefit in the form of reduced monthly fees. *See Alesci*, 97 Ohio St.3d 210, 2002-Ohio-5932, 777 N.E.2d 835, at ¶ 20. And, as we have explained, it was permissible for the commission to infer that Seibert was engaged in sustained remunerative activities based on his bartering relationship with Davis.

{¶ 40} The commission's finding that Seibert committed fraud was supported by some evidence. As the court of appeals noted in its decision, Seibert testified at the hearing that he was aware that the types of activities he was performing at the raceway were ordinarily compensable. He also testified that he knew that he was not permitted to work while receiving PTD compensation. Seibert, however, repeatedly represented to the bureau that he was not working. From 2008 to 2014, the bureau annually sent letters to Seibert asking him whether he either was working or had worked since he began receiving PTD compensation. Each time, he answered "no." Under these circumstances, we conclude that there was at least some evidence in the record to enable the commission to find that Seibert falsely represented that he was not working and that he made the false representations knowingly.

{¶ 41} Moreover, even absent proof that Seibert actually knew that he was making false representations to the bureau, he exhibited "such utter disregard and recklessness" as to the representations' "tru[th] or fals[ity] that [his] knowledge

may be inferred" under *Gaines*, 33 Ohio St.3d at 55, 514 N.E.2d 709. Stated another way, Seibert exhibited a "[c]onscious indifference," *Black's Law Dictionary* 573 (10th Ed.2014) (defining "reckless disregard"), to the truthfulness of his representations to the bureau. Seibert told the bureau that he was not working even though he knew both that the types of activities he was performing were ordinarily compensable and that his receipt of PTD compensation barred work activities. Thus, even crediting Seibert's claimed lack of actual knowledge concerning the falsity of his representations, he was at least reckless when it came to construing the propriety of his activities against the boundaries of the workers' compensation laws. In spite of all this, Seibert provided answers to the bureau that enabled him to receive PTD compensation. Seibert's conscious indifference to the truth provides a basis for inferring that he knew that he was making false representations to the bureau.

## CONCLUSION

{¶ 42} For the foregoing reasons, we affirm in part and reverse in part the court of appeals' judgment denying the requested writ of mandamus. Based on our determination that the commission abused its discretion in terminating Seibert's PTD compensation as of March 26, 2009, we reverse in part the judgment of the Tenth District Court of Appeals and issue a limited writ directing the commission to determine, based on the evidence in the record, an appropriate date of termination of Seibert's PTD compensation. In all other respects, we affirm the judgment of the Tenth District Court of Appeals.

Judgment affirmed in part
and reversed in part,
and limited writ granted.

O'CONNOR, C.J., and FISCHER, DEWINE, DONNELLY, and STEWART, JJ., concur.

KENNEDY, J., concurs in part and dissents in part, with an opinion.

_____

**KENNEDY, J., concurring in part and dissenting in part**.

{¶ 43} I concur in part and dissent in part. I agree with the majority opinion's conclusions that the record contains some evidence to support appellee Industrial Commission's findings that appellant Kenneth J. Seibert's raceway activities constituted sustained remunerative employment and that Seibert committed fraud. But I part ways with the majority's conclusion that there is no evidence in the record to support the commission's determination that Seibert began engaging in sustained remunerative employment on March 26, 2009. Because there is some evidence to support the commission's finding that Seibert had been engaged in sustained remunerative employment since March 26, 2009, I would affirm the court of appeals' judgment denying the requested writ of mandamus.

{¶ 44} It is well-established that "[t]he commission is exclusively responsible for assessing the weight and credibility of evidence." *State ex rel. George v. Indus. Comm.*, 130 Ohio St.3d 405, 2011-Ohio-6036, 958 N.E.2d 948, ¶ 11. Further, while the commission's authority is not unlimited, it "has substantial leeway to draw inferences from the evidence before it." *State ex rel. McBee v. Indus. Comm.*, 132 Ohio St.3d 209, 2012-Ohio-2678, 970 N.E.2d 937, ¶ 10. As long as the commission's order is supported by some evidence, there is no abuse of discretion and we must uphold the decision. *State ex rel. Pass v. C.S.T. Extraction Co.*, 74 Ohio St.3d 373, 376, 658 N.E.2d 1055 (1996). We are not to "second-guess the commission's evaluation of the evidence." *State ex rel. Black v. Indus. Comm.*, 137 Ohio St.3d 75, 2013-Ohio-4550, 997 N.E.2d 536, ¶ 22. The commission abuses its discretion when there is "no evidence" to support its factual conclusion. *State ex rel. Hutton v. Indus. Comm.*, 29 Ohio St.2d 9, 278 N.E.2d 34 (1972), syllabus.

{¶ 45} The commission terminated Seibert's receipt of permanent-total-disability ("PTD") compensation effective March 26, 2009, finding that Seibert had

been engaged in sustained remunerative employment since that date. Seibert admitted that on March 26, 2009, he received a $350 check from Lebanon Trotting Club as prize earnings for a horse he had owned. In June 2014, Seibert told agents with the Special Investigations Department ("SID") of the Bureau of Workers' Compensation that he had been working at Lebanon Raceway for the past four to five years. Seibert also stated that he had been involved in the business of training and racing horses since the late 1980s and that he had known Jim Davis since that time. Davis told SID agents that Seibert had been around the barns at the raceway for as long as Davis could remember. Seibert informed SID agents that Davis would often waive fees related to Seibert's horses—stall rental, hay, bedding, and shoeing—in exchange for the work Seibert did for Davis, which included running, bathing, and feeding two or three of Davis's horses. Davis confirmed that Seibert was not paid for the work he performed, because of the waived fees for the upkeep of Seibert's horses. Seibert stated that prior to his arrangement with Davis, his horses had been with Johnny Ingram for a time and with Doug Stovall for a time. Seibert testified that he had performed for Stovall services similar to those that he was performing for Davis. Jeffrey Nisonger also informed SID agents that Seibert had worked for Stovall.

{¶ 46} The commission did not abuse its discretion in concluding that Seibert had been engaged in sustained remunerative employment since March 26, 2009. Standing alone, Seibert's ownership of a horse and the attendant prize winnings do not establish that he had been engaged in sustained remunerative employment; the prize money demonstrates merely that he was training and racing one of his horses in March 2009. But the evidence also established that Seibert defrayed the cost of his horses' upkeep by working at the Lebanon Raceway caring for other owners' horses. Additionally, Seibert stated that he had been working at the raceway for the past four to five years. It is reasonable to infer from this evidence that Seibert was bartering his services to other horse owners to offset the

upkeep cost for the horse that won the March 26, 2009 purse. Accordingly, there is "some evidence" to support the commission's decision to terminate Seibert's receipt of PTD compensation effective March 26, 2009, as he was engaged in sustained remunerative employment.

{¶ 47} Therefore, I concur in part and dissent in part and would affirm the court of appeals' judgment denying the requested writ of mandamus.

_____

Becker & Cade and Dennis A. Becker, for appellant.

Dave Yost, Attorney General, and Kevin J. Reis, Assistant Attorney General, for appellee.

_____