THE STATE EX REL. PENWELL, APPELLANT, *v.* INDUSTRIAL
COMMISSION ET AL., APPELLEES.

[Cite as *State ex rel. Penwell v. Indus. Comm.*,
142 Ohio St.3d 114, 2015-Ohio-976.]

(No. 2013–0624—Submitted January 13, 2015—Decided March 19, 2015.)

**Per Curiam.**

{¶ 1} We affirm the judgment of the court of appeals in this challenge to the denial of an additional award for violation of a specific safety requirement ("VSSR") in the workers' compensation system. Relator-appellant, Cathy S. Penwell, challenged the decision of respondent-appellee Industrial Commission when it denied her application for a VSSR award against her employer, respondent-appellee Amanda Bent Bolt Company ("ABB").

{¶ 2} Penwell alleges that her injuries were caused by ABB's failure to provide adequate safety restraints under the applicable safety rule. The commission denied Penwell's VSSR application on the basis that her injuries were caused by a one-time failure of the safety devices. The court of appeals found that the commission had not abused its discretion and denied a writ of mandamus.

{¶ 3} We affirm.

*Facts and procedural posture*

{¶ 4} Penwell was employed as a press operator for ABB. She produced various metal parts using a 75–ton Bliss OBI hydraulic press. On May 18, 2007, Penwell was injured when her left hand was crushed in the press. Her workers' compensation claim was allowed for various serious injuries to her left hand, including multiple fractures and the amputation of fingers, as well as for posttraumatic stress and depression.

{¶ 5} The machine Penwell was operating had what is termed a pullback restraint system. Two cables, one for each of the operator's hands, are attached to the top of the press. A safety bar is also attached to each side of the press. The operator wears wrist restraints attached to the cables. When the ram descends on the press, the cables, operating on a pulley system, pull the operator's hands out of the point of operation.

{¶ 6} ABB held monthly safety meetings for employees, which Penwell attended. Each safety meeting had a typed agenda, which included a printed reminder that operators were not to rely solely on the safety pullbacks to keep their hands out of a machine. The rationale for this warning was that any mechanical device can fail.

{¶ 7} On the day of the injury, another worker, Donald Coe, ran the machine in question, No. 885, before Penwell. He checked the pullback cables to ensure that they were not worn and that the screws were tight. He worked for over two hours and could detect nothing wrong with the equipment. Gary Lama, a cell leader at ABB, asserted that he could not remember any trouble with machine No. 885, and the safety pullbacks have always been in good shape.

{¶ 8} The pullback restraint system was then adjusted specifically for Penwell by Thomas Payne, a "set-up man" for ABB. Payne set the safety cables on the machine for Penwell by moving her back two links on the safety chains, as her reach was greater than Coe's. Her hands were even with each other when Payne finished the adjustments. Payne watched Penwell run two parts on the machine to make sure that she could get the parts out of the die. He noted nothing unusual with the safety devices on her machine.

{¶ 9} After Payne had set up the machine, Penwell punched holes in five parts. She then performed a required quality-control inspection of the parts. To do so, she had to leave the machine, which meant she had to unhook her wrist restraints from the cables. After she completed the quality-control check, she rehooked the cable restraints and ran a number of parts through the machine. At some point, the ram descended on Penwell's left hand, causing the injuries.

{¶ 10} After the injury, ABB investigated the accident. The investigation revealed that the weld on the left-side safety bar was broken, and the bar was bent up. Polly Puterbaugh, personnel director of ABB, testified that bending the safety bar would take a "strenuous" force. She testified that the safety cables are "like airplane cables," and it was most likely that one of the cables had become wrapped around the bar and caused the damage. She also testified that May 18, 2007, was the first time in her 38 years at ABB that there had ever been a malfunction of the safety guards on No. 885. Nor had there ever been an instance, on any press, of a safety cable from a pullback restraint wrapping

around a safety bar or a weld on a safety bar breaking, allowing the bar to be bent upward.

{¶ 11} In addition to her workers' compensation benefits, Penwell applied for a VSSR award. The commission, through its staff hearing officer ("SHO"), considered the application on December 14, 2010. Based on the testimony that ABB had never seen or been advised of a safety bar being bent in the manner described here, the SHO found that the accident was a one-time malfunction of the pullback system. The SHO also found that there was no evidence that the press had double-tripped or that there was any other mechanical defect with the press.

{¶ 12} The SHO concluded that that there was no evidence of a VSSR. Penwell had alleged violations of Ohio Adm.Code 4123:1–5–01(B)(105) and 4123:1–5–11(E). The SHO found that the first regulation is merely definitional and therefore does not state a specific safety requirement. The SHO also found that under Ohio Adm.Code 4123:1–5–11(E), which concerns hydraulic or pneumatic presses, a pullback system is one of the acceptable ways to guard a hydraulic press. The SHO further found that there is no requirement that a safety device must be completely fail-safe. The commission denied Penwell's request for reconsideration, and she filed a complaint in mandamus in the Tenth District Court of Appeals.

{¶ 13} The magistrate for the court of appeals considered the two issues Penwell raised: (1) whether the commission's application of the "single failure" exception to VSSR liability is precluded by evidence that ABB repeatedly informed its operators not to rely on the pullback guards and (2) whether ABB failed to guard the press because it did not provide a set-up person to assist the operator in unhooking and rehooking the pullback guards during quality-control inspections. The magistrate found that the single-failure exception was not precluded by the information given to the operators and that ABB did not fail to guard the press by not providing a set-up person to assist the operator in the manner advocated by Penwell.

{¶ 14} Specifically, as to the first issue, the magistrate concluded that ABB's safety meetings and its warnings that employees not rely solely on the pullback system were components of a good safety policy, not evidence that ABB either knew that the pullback system would fail or had such concerns about the system that it should have explored other methods of protecting the operator.

{¶ 15} As to the second issue, the magistrate agreed with the SHO's determination that a set-up person did not have to be present whenever an operator unhooked and rehooked, because the initial adjustment would remain the same. Moreover, the safety rule itself does not demand that a set-up person be present for the quality-control step.

{¶ 16} Penwell filed objections to the magistrate's decision, but the court of appeals overruled the objections, adopted the magistrate's decision, and denied the writ. Penwell appealed to this court.

## Analysis

{¶ 17} To establish entitlement to a VSSR award, a claimant must show that there is a specific safety rule ("SSR") applicable to the employer, that the employer violated that SSR, and that the violation proximately caused the injury. *State ex rel. Supreme Bumpers, Inc. v. Indus. Comm.*, 98 Ohio St.3d 134, 2002-Ohio-7089, 781 N.E.2d 170, ¶ 46. The interpretation of the SSR rests with the commission. *State ex rel. Berry v. Indus. Comm.*, 4 Ohio St.3d 193, 194, 448 N.E.2d 134 (1983). But because a VSSR award is a penalty, the commission must resolve all reasonable doubts in favor of the employer. *State ex rel. Richmond v. Indus. Comm.*, 139 Ohio St.3d 157, 2014-Ohio-1604, 10 N.E.3d 683, ¶ 17; *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170, 172, 545 N.E.2d 1216 (1989).

{¶ 18} The only SSR at issue is Ohio Adm.Code 4123:1–5–11(E), which includes a "pull guard" as an acceptable safety device for a hydraulic press:

Hydraulic or pneumatic presses.

Every hydraulic or pneumatic (air-powered) press shall be constructed, or shall be guarded, to prevent the hands or fingers of the operator from entering the danger zone during the operating cycle. Acceptable methods of guarding are:

(1) "Fixed barrier guard"—an enclosure to prevent hands or fingers from entering the danger zone;

(2) "Gate guard"—a movable gate operated with a tripping device to interpose a barrier between the operator and the danger zone and to remain closed until the down stroke has been completed;

(3) "Two-hand control"—an actuating device which requires the simultaneous use of both hands outside the danger zone during the entire closing cycle of the press;

(4) *Pull guard—attached to hands or wrists and activated by closing of press so that movement of the ram will pull the operator's hands from the danger zone during the operating cycle;*

(5) Restraint or hold-back guard—with attachments to the hands or wrists of the operator to prevent hands or fingers entering the danger zone during the operating cycle;

(6) Other practices, means or methods which will provide safeguards, preventing the hands or fingers of the operator from entering the danger zone during the operating cycle and which are equivalent in result to one of the types specified above.

(Emphasis added.)

{¶ 19} Penwell was operating a hydraulic press that was equipped with a pullback restraint system to pull the operator's hands out of the danger zone during the operating cycle, as described in Ohio Adm.Code 4123:1–5–11(E)(4). The press in question was therefore equipped with an acceptable safety device under the regulation.

{¶ 20} Penwell suggests that ABB had a duty to determine whether there were more effective safety devices for the press. However, an allegation that an employer has violated a duty to its employees cannot justify a VSSR award unless the SSR plainly apprises the employer of that duty. A VSSR award is given only when an employer's acts contravene express, specific, and definite statutory or regulatory provisions. *State ex rel. Trydle v. Indus. Comm.*, 32 Ohio St.2d 257, 291 N.E.2d 748 (1972), paragraph one of the syllabus.

{¶ 21} ABB used an approved guard for its hydraulic press. That is the only duty imposed by the SSR. Therefore, the mere fact that there might be some other or better guarding mechanism for the press is immaterial.

{¶ 22} Penwell's primary argument is that the commission's decision was based solely on the "one-time malfunction" defense and was not supported by evidence in the record. The one-time-malfunction defense comes from our holding in *State ex rel. M.T.D. Prods., Inc. v. Stebbins,* 43 Ohio St.2d 114, 118, 330 N.E.2d 904 (1975), in which we observed that a safety rule "does not purport to impose absolute liability for an additional award whenever a safety device fails. The regulation does not forewarn the employer that, in addition to providing a safety device, the safety device must also be completely failsafe." Thus, "[t]he fact that a safety device that otherwise complies with the safety regulations failed on a single occasion is not alone sufficient to find that the safety regulation was violated." *Id.* Citing *M.T.D. Prods.,* we have recognized the "one-time malfunction" exception or defense on several occasions. *State ex rel. Gentzler Tool & Die Corp. v. Indus. Comm.*, 18 Ohio St.3d 103, 480 N.E.2d 397 (1985); *State ex rel. Taylor v. Indus. Comm.*, 70 Ohio St.3d 445, 639 N.E.2d 101 (1994). Under this exception, the question before the commission is "whether [the employer] had ever been forewarned of the malfunction on the date of injury by a prior malfunction of the safety device." *State ex rel. Precision Thermo–Components, Inc. v. Indus. Comm.*, 10th Dist. Franklin No. 09AP–965, 2011-Ohio-1333, 2011 WL 983165, ¶ 29. Therefore, the question here is whether there was evidence of

a prior history of malfunctions or problems such that ABB should have been aware that a malfunction would occur.

{¶ 23} The evidence shows that the pullback safety system was in good working order on the date of the accident. Another worker, Donald Coe, operated the machine earlier that same day. He checked the pullback cables and checked that all the screws were tight. He did not detect any problem with the safety equipment. Thomas Payne then adjusted the safety cables specifically for Penwell and noticed nothing out of the ordinary. Penwell ran five parts through the press with no incident before unhooking the cables to perform a quality-control check. She then reattached the pullback guards and ran more parts before the injury occurred. Moreover, ABB provided evidence that similar presses had been operated for at least 38 years without a single failure of a pullback guard.

{¶ 24} Penwell argues that because ABB trained its employees not to rely solely on the pullbacks to keep their hands safe, ABB somehow knew that the safety pullbacks would someday fail. However, unlike in some of the cases cited by Penwell, the unrefuted evidence here is that the safety pullbacks had never failed or malfunctioned on the press in question, nor had ABB been aware of any pullback malfunction on any of its presses for nearly four decades.

{¶ 25} Safety regulations do not impose strict liability on employers whenever a safety device fails. "[T]he purpose of specific safety requirements [is to provide] *reasonable,* not absolute, safety for employees. Decisions of this court have acknowledged the practical impossibility of guaranteeing that a device will protect against all contingencies or will never fail." (Emphasis sic.) *State ex rel. Jeep Corp. v. Indus. Comm.,* 42 Ohio St.3d 83, 84, 537 N.E.2d 215 (1989).

{¶ 26} Moreover, we reject Penwell's argument that a set-up person should have supervised her when she put the pullbacks back on after performing the quality-control check. Ohio Adm.Code 4123:1–5–11(E) does not specify any particular training or supervision for an employee's use of the pullback restraints. The SSR does not impose a duty of constant surveillance over the equipment. *State ex rel. Frank Brown & Sons, Inc. v. Indus. Comm.,* 37 Ohio St.3d 162, 164, 524 N.E.2d 482 (1988). The set-up man in this case correctly adjusted the pullbacks to fit Penwell's size and reach and watched her run several parts to confirm the adjustment. The commission reasonably concluded that he did not need to be present when Penwell unhooked and rehooked the restraints.

{¶ 27} Finally, Penwell argues that the court of appeals and its magistrate improperly reweighed the evidence. However, the magistrate and court of appeals merely reviewed the evidence in a proper effort to determine whether there was sufficient evidence in the record to support the commission's conclusion that the failure that caused Penwell's injury was a one-time occurrence.

*Conclusion*

{¶ 28} The pullback guards on the press that Penwell was operating when she was injured are an acceptable safety mechanism under the rule. ABB was correctly allowed to use the one-time-malfunction defense because there was no indication of any malfunction on the day of the injury and there was evidence in the record that no malfunction of similar devices at ABB had occurred in at least 38 years. The commission did not abuse its discretion in denying a VSSR award, and the court of appeals did not reweigh the evidence or otherwise improperly review the case.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

———————

Reminger Co., L.P.A., and Kevin R. Sanislo, for appellant.

Hahn, Loeser & Parks, L.L.P., and Douglas J. Suter, for appellee Amanda Bent Bolt Company.

Michael DeWine, Attorney General, and Cheryl J. Nester, Assistant Attorney General, for appellee Industrial Commission.