[Cite as *State ex rel. Universal Metal Products, Inc. v. Indus. Comm.*, 2024-Ohio-1450.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Universal Metal Products, Inc., :

      Relator, : No. 22AP-608

v. : (REGULAR CALENDAR)

Industrial Commission of Ohio et al., :

      Respondents. :

---

D E C I S I O N

Rendered on April 16, 2024

---

**On brief:** *Wegman Hessler LPA*, and *Christopher A. Holecek*, for relator.

**On brief:** *Dave Yost*, Attorney General, and *Andrew J. Alatis*, for respondent, Industrial Commission of Ohio.

**On brief:** *Nager Romaine & Schneiberg Co. L.P.A.*, *Jerald A. Schneiberg*, and *Catherine B. Lietzke*, for respondent, Christopher Ladson.

---

IN MANDAMUS
ON OBJECTION TO THE MAGISTRATE'S DECISION

JAMISON, J.

{¶ 1} Relator, Universal Metal Products, Inc. ("Universal"), seeks a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order finding relator committed a violation of a specific safety requirement ("VSSR").

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a court magistrate. On December 4, 2023, the magistrate issued a decision containing findings of fact and conclusions of law, which is appended hereto. The magistrate reached the following conclusions: 1) the record contains some evidence

supporting a finding that Universal was aware that one of the levers on the press was tied down, thereby disabling the two-hand control guarding mechanism; 2) the record contains some evidence to support finding that Ladson did not unilaterally violate the specific safety requirement by deliberately circumventing or disabling a safety device or refusing to use employer-provided safety equipment; and 3) the staff hearing officer ("SHO") did not shift the burden for establishing a VSSR claim, but simply found that Universal failed to prove the asserted defense of unilateral negligence.

{¶ 3}    Universal timely filed an objection to the magistrate's decision and both the commission and Ladson filed a response.  Universal asserted the following objection to the magistrate's decision:

> 1. The Magistrate's conclusion that "some evidence supports the finding Universal was aware the lever was tied down" is fatally flawed.

(Respondent's Obj. to Mag.'s Decision at 4.)

{¶ 4}    Universal first contends that because there was no direct evidence to support a finding that others observed Ladson operating the press with one of the levers tied down, the magistrate erred in concluding the award was supported by some evidence in the record.  We disagree.

{¶ 5}    The magistrate determined the evidence presented at the hearing permitted a reasonable inference that Universal knew Ladson was operating the press with one of the safety handles disabled.  There is some evidence in the record to support that decision, as the evidence shows that Ladson had been operating the machine for several hours before he sustained his injury, his supervisor's desk was located near the press, and other employees and supervisors were present in the general area as appellant was operating the press.  Ladson also testified that he had been trained to operate the press using just one lever and he had done so on prior occasions.

{¶ 6}    Universal argues that the magistrate ignored documented proof that Ladson had been trained in the proper use of the press.  Under the "some evidence" standard, however, the existence of contradictory evidence in the record does not necessarily invalidate the commission's factual findings. *State ex rel. Cleveland Wrecking Co. v. Indus. Comm.*, 35 Ohio St.3d 248, 251 (1988).  A court of appeals may not substitute its own

opinion on factual matters for that of the commission. *Id.* Accordingly, we agree with the magistrate that the resolution of contradictory evidence as to Ladson's training was within the purview of the commission.

{¶ 7} Universal also argues that the magistrate ignored the testimony of Ladson's supervisor who stated that the levers on the press are not visible to others when the operator is sitting at the machine. The stipulated record, however, contains photocopies of several photographs taken of the press and the surrounding work area. The SHO had the opportunity to view the photographic evidence and to determine whether the levers would have been observable to others either working in the immediate area or walking by. Thus, we agree with the magistrate that the SHO was in the best position to review the evidence and make the necessary determination.

{¶ 8} In a related argument, Universal claims that the magistrate misconstrued and misapplied *State ex rel. Penwell v. Indus. Comm.*, 142 Ohio St.3d 114, 2015-Ohio-976, and in so doing, the magistrate erroneously imposes a duty of constant surveillance on Universal. We disagree.

{¶ 9} The magistrate found *Penwell* was distinguishable on its facts because that case involved an unanticipated failure of a safety device, whereas this case involved a safety device that was intentionally disabled under circumstances where the evidence showed the employer was aware it had been disabled. We agree with the magistrate and, for the reasons set forth in the magistrate's decision, we find *Penwell* is distinguishable on its facts.

{¶ 10} Universal next contends that the magistrate erred in concluding that Ladson's unilateral negligence did not bar his recovery. Again, we disagree.

{¶ 11} The magistrate correctly explained that the employer avoids liability using the defense of unilateral employee negligence only if the employee unilaterally violates a safety requirement. After examining the stipulated record, the magistrate concluded that some evidence supported the order because there was testimony Ladson was trained to use one lever as a normal operating procedure for the press. According to the magistrate, this testimony provided some evidence to support a finding that Universal did not satisfy its initial obligation of equipping the press with an acceptable method of guarding. We agree with the magistrate's analysis and, for the reasons set forth in the magistrate's decision, we conclude that the defense of unilateral employee negligence does not apply in this case.

**Conclusion**

{¶ 12} Following an independent review of this matter, we find that the magistrate has determined the relevant facts and appropriately applied the law to those facts. Therefore, we overrule Universal's objection and adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny Universal's request for a writ of mandamus.

*Objection overruled*;
*writ of mandamus denied.*

LUPER SCHUSTER and BOGGS, JJ., concur.

———————————

# APPENDIX

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

State ex rel. Universal Metal Products, Inc.,   :

          Relator,                              :                    No.  22AP-608

v.                                              :                    (REGULAR CALENDAR)

Industrial Commission of Ohio et al.,           :

          Respondents.                          :

---

## M A G I S T R A T E ' S   D E C I S I O N

### Rendered on December 4, 2023

---

*Wegman Hessler LPA*, and *Christopher A. Holecek*, for relator.

*Dave Yost*, Attorney General, and *Andrew J. Alatis*, for respondent Industrial Commission of Ohio.

*Nager Romaine & Schneiberg Co. L.P.A.*, *Jerald A. Schneiberg*, and *Catherine B. Lietzke*, for respondent Christopher Ladson.

---

### IN MANDAMUS

{¶ 13} Relator Universal Metal Products, Inc. ("Universal") seeks a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order finding relator committed a violation of a specific safety requirement ("VSSR").

## I. Findings of Fact

{¶ 14} 1. On April 26, 2019, while employed as an assembler by Universal, respondent Christopher Ladson sustained a work-related injury to his right hand when

Ladson actuated a hydraulic press used to make refrigerator hinges while his hand was inside the press.

{¶ 15} 2. A first report of injury, occupational disease or death form ("FROI-1") was filed with the Bureau of Workers' Compensation ("bureau") on April 29, 2019.

{¶ 16} 3. Ladson's workers' compensation claim was allowed for non-displaced open fracture proximal phalanx right forth finger; unspecified sprain right wrist; non-displaced open fracture proximal phalanx right third finger; non-displaced open fracture distal phalanx right second finger; non-displaced fracture middle phalanx right third finger.

{¶ 17} 4. Ladson filed an application for additional award for violation of specific safety requirement in a workers' compensation claim ("IC-8/9") on April 2, 2021. Ladson alleged violations of the following sections of the Ohio Administrative Code: 4123:1-5-01(A), 4123:1-5-11, 4123:1-5-11(E), and 4123:1-5-11(E)(1)-(6). In the application, Ladson described how the injury occurred as: "[P]ress crushed hand. It was tied down on one side." (Stip. at 3.)

{¶ 18} 5. Ladson filed an amended IC-8/9 dated April 16, 2021 alleging violations of the following sections of the Ohio Administrative Code: 4123:1-5-01(A), 4123:1-5-10, 4123:1-5-11, 4123:1-5-11(E), and 4123:1-5-12(C). Ladson described how the injury occurred as: "Hydraulic press was tied to increase productivity [and] it dropped down on his fingers." (Stip. at 12.)

{¶ 19} 6. Ladson filed another amended IC-8/9 on June 18, 2021. Ladson alleged violations of the following sections of the Ohio Administrative Code: 4123:1-5-01(A), 4123:1-5-10, 4123:1-5-11, 4123:1-5-11(E), 4123:1-5-11(E)(1)-(6), and 4123:1-5-12(C).

{¶ 20} 7. Universal filed responses to the IC-8/9 VSSR applications on April 13, May 3, and June 30, 2021. Universal denied all allegations in the applications.

{¶ 21} 8. The bureau's Safety Violations Investigations Unit released a report of investigation dated July 13, 2021.

{¶ 22} 9. A commission staff hearing officer ("SHO") conducted a hearing on the application for VSSR award on April 7, 2022 and issued an interlocutory advisement order pending receipt of the hearing transcript on April 14, 2022.

{¶ 23} 10. At the hearing, Ladson and Mitchel Wilson, supervisor for Universal, testified. Ladson testified that his job duties as an assembler at Universal required him to rotate to different machines during the week. Ladson stated that he was paid hourly. Ladson testified as follows regarding production expectations and incentives:

[Ladson's counsel]: And were you given any bonus, or incentive, if you meet a certain production on a daily basis?

[Ladson]: No. What it would be is if you're not keeping up 80 to 90, we could be terminated.

[Ladson's counsel]: What do you mean by 80 to 90?

[Ladson]: Okay. There's a scale as far as the amount of work we put out during the week or the month, and if we fail below the 80 percent, they had a percentage scale, we could be terminated if we weren't over 80 to 90 to 100.

[Ladson's counsel]: Is this like a production kind of quota?

[Ladson]: Yes.

* * *

[Ladson's counsel]: Do you know employees who were warned, or had meetings about their production output?

[Ladson]: Some of them were terminated for not meeting the quota. Especially the temp to hire guys.

[Ladson's counsel]: Okay. And if you had performed significantly high production you weren't rewarded in any way?

[Ladson]: No. It just secured your job. You kept your job.

(Stip. at 840-41.)

{¶ 24} On April 26, 2019, Ladson arrived at work at approximately six in the morning and began operating the press at issue to make hinges for a refrigerator. Ladson was working on the press for about three to four hours before he was injured. When using the press, Ladson sat on a stool directly facing the press and placed parts inside the press. The press had two levers, one on the right and one on the left of the press.[1] When the parts were placed, he stated that "you take your hand out, and push the lever down and it comes down, and goes back up, and you reach in and grab it out and put it in the bin." (Stip. at 841.) Ladson stated that the left lever of the press was tied down by a rag or piece of cloth

---

[1] At various points in the transcript, the "levers" on the press were also called "handles" by the witnesses. These terms are used interchangeably in this decision.

when he started work. To operate the press, Ladson stated he used "[o]ne lever, when I was trained on it or showed how to do it, one was loose, and the left lever was tied down. I have no reason to know why it was tied down or anything, and didn't think anything of it." (Stip. at 841.) With the left lever tied down, Ladson agreed that only the right lever was required to operate the machine.

{¶ 25} Ladson described the injury to his right hand while using the press as follows:

When I went to reach in to pull the part out all of a sudden it just came down on my hand and I jumped up. I was working in a glove and I didn't even know my hand was severely injured because I didn't feel anything. * * * I went to take the glove off and it was full of blood, and Mitch [Wilson], which was the supervisor, took me to the sink and rinsed it with water, and then, wrapped it up to take me to the emergency room.

(Stip. at 842.) When asked how long it took Wilson to come to Ladson after he was injured, Ladson stated: "Mitch's desk is right behind me. * * * As soon as he heard the boom, the next thing I know he's there with a knife in his hand cutting the tie to the left lever that was tied down off." (Stip. at 842.)

{¶ 26} Ladson had worked on the press at which the injury occurred several times prior to his injury. He stated that he remembered the first time he was trained to use the press or that he used the press in question. Ladson stated that either Sherry Whitting, Ladson's "lead person" on the day of the injury,[2] or Wilson trained him in 2017 when he first began employment with Universal. (Stip. at 848.) Ladson worked on the press in question "very seldom" but agreed that he likely operated the press for "[o]ver 40 hours" before he was injured. (Stip. at 850.)

{¶ 27} According to Ladson, the left lever was tied down every time he operated the press. When asked whether he "ever used that machine without any rags tieing [sic] any of the levers down," Ladson responded: "No. I was always operating the one lever." (Stip. at 850.) Ladson stated he did not know who tied down the lever. When asked why he did not cut the rag off of the press, Ladson responded: "That's the normal operating procedure. That's what I thought. Normally I don't work on that side. That day I worked on that side,

---

[2] Ladson stated that Whitting was "the one we would go to if Mitch [Wilson] wasn't there." (Stip. at 849.)

and other times -- I think Sherry trained me. She showed me the one lever." (Stip. at 858.) Asked whether he ever had any discussion with anybody prior to his injury about the rag, Ladson responded: "No, I didn't think anything of it. I didn't think it would cause injury or anything. I didn't know the operation as far as the mechanics of it. I was just shown push the one lever down and it comes up." (Stip. at 859.) Ladson was asked, "Did it ever come to your mind, wait a minute, this rag is here to circumvent something, maybe it's not safe to use it," to which he responded: "No. That's how it was demonstrated to me. I just thought that's how it was." (Stip. at 859.) When asked, "So whoever the person was that showed you, whether it was Sherry or Mitch, your testimony is they just did the one lever," Ladson stated: "That's correct." (Stip. at 859.)

{¶ 28} When asked whether he reported to Whitting that there was a rag on the handle, Ladson replied: "No. Her desk was right there. She could see it." (Stip. at 848.) Ladson further agreed that a rag on the handle of the press would be plainly visible to anyone walking through, specifically including Wilson and Whitting. Ladson stated that Wilson and Whitting had walked by him while he was working at the press on the day of the injury and had not said anything to him about the tied lever.

{¶ 29} Asked whether he understood that engaging in any unsafe conditions was a safety violation at Universal, Ladson replied: "Well, the supervisors check the machines before we come in." (Stip. at 845.) Ladson stated that he was not responsible for setting up the machine: "The supervisors check all the machines, and then, we have paperwork to sign initially. But he has to inspect all of the machines. The lock out, tag out on the machines. They have to do that, and then, they sign off on it, and then, we sign our initials and go to work." (Stip. at 850.) Ladson testified that maintenance "would come work on" the press during his shift, although he could not say how many times this occurred. (Stip. at 843.)

{¶ 30} Ladson agreed he signed safety rules documentation which included instructions that "all guards and sensors must be in place and in good condition when the machine is operating." (Stip. at 845.) Viewing photographs of the press, Ladson testified that a sign stating, "Do not tie handle down on multipress," was not on the press at the time of his injury. (Stip. at 844.) Ladson stated he was not reprimanded after his injury for the left lever being tied down:

It was never mentioned to me about the rag on the machine. I was never reprimanded or called into the office. The only time that it was mentioned was the accident report. When I came back from the emergency room that particular day Mitch asked me did I tie it down. And I said "no." I asked him why would I tie it down? I wouldn't know how.

(Stip. at 850.) According to Ladson, he had never received any verbal warnings or formal disciplinary write-ups about his safety or safety activities.

{¶ 31} 11. Wilson testified at the VSSR hearing that the press on which Ladson was injured was a hydraulic press. Wilson started work between 4:30 and 5:30 a.m. every morning. Wilson stated that Whitting was the lead person and started at 4:00 a.m. on the day of Ladson's injury. According to Wilson, Whitting stated she did not see the handle tied down on the press prior to Ladson's injury. On the day of the injury, the night shift supervisor was Brian Klein. Wilson testified that he spoke to Klein after Ladson's injury. According to Wilson, Klein stated there was not a rag on the handle of the press. Wilson had no idea who tied the handle on the press down.

{¶ 32} According to Wilson, Universal's safety rules explained guarding and two-hand controls. Wilson agreed that the importance of two-hand controls was explained to Ladson. Wilson recalled discussing with Ladson the importance of making sure that guards were not defeated in any way, stating that "[w]e have training classes at least once a year, if not more." (Stip. at 852.) After Ladson's injury, Wilson stated that he "explained to [Ladson], that's why we don't tie handles down." (Stip. at 854.)[3] There was no written record of Ladson receiving any reprimand related to the April 26, 2019 incident.

{¶ 33} Wilson testified that before Ladson was hurt, there was a sign on the press that said do not tie handle down. Presented with Ladson's statement that there was not a warning sign on the machine at the time of injury, Wilson stated: "There was another sign here up above it. I put new ones on after he was injured." (Stip. at 853.) Asked why the existing sign was changed and a different sign was put in place, Wilson stated: "We had cleaning crews come through, and they clean presses and stuff. We had two young boys that cleaned all the machines and they wiped it off." (Stip. at 853.) When asked "[w]hy would

---

[3] When asked by the SHO whether there was any document indicated there was an oral reprimand given to Ladson, Universal's counsel replied: "Other than what Mr. Wilson testified to." (Stip. at 859.)

you need a sign on the press saying do not tie handles down if you give employee training telling them not to tie handles down," Wilson responded, "I do not understand that, but I like to be sure that people know." (Stip. at 853.)

{¶ 34} Wilson testified that he had seen the right or left handle tied down on the press at issue "[o]ne other time" prior to Ladson's injury. (Stip. at 854.) In that prior instance, Wilson stated that "[w]e walked up on the individual and saw the handles tied down, and he got a written warning on it." (Stip. at 854.) Wilson also stated that the levers on the press were not clearly visible to people walking by "when a person is sitting there, but when the machine is empty, yes." (Stip. at 855.) When asked whether it was a true statement that "Ladson said he used that machine at least three times, maybe more, before he got hurt, and every time he used that machine the handle was tied down," Wilson replied: "I could not -- I don't understand why because I walk right by it. We have people walking by it all the time." (Stip. at 854.) Wilson agreed that "people go back and forth by that machine every single day, going in and out of the lunchroom." (Stip. at 854.) Wilson stated he had never seen the machine tied down more than the single, aforementioned incident prior to Ladson's injury and no one had ever reported that they saw the machine tied down.

{¶ 35} 12. On July 19, 2022, the SHO issued an order granting Ladson's application for a VSSR award. The SHO found Ladson dismissed all alleged violations except Ohio Adm.Code 4123:1-5-11(E)(3) and (6). The SHO found that "the safety mechanism (two lever operation) of the hydraulic press was bypassed by someone." (Stip. at 956.) The SHO found it was "not refuted that this left lever was tied down when this work injury occurred" and, further, found "the Injured Worker's testimony credible that this left lever was tied down." (Stip. at 956.) The SHO found that Ohio Adm.Code 4123:1-5-11(E) applied to the press involved in Ladson's injury.

{¶ 36} With regard to Ohio Adm.Code 4123:1-5-11(E)(3), the SHO found the press utilized during the work injury was covered by this section. Furthermore, the SHO found:

The Injured Worker was operating this type of machine covered by this section ((E)(3)). The Employer had control of this machine, would inspect the machine, and the machine was in plain few [sic] of workers and management. Therefore, this code section applies, and violations pertaining to this machine are covered by the section.

(Stip. at 956.) With regard to the alleged violation of Ohio Adm.Code 4123:1-5-11(E)(6), the SHO found:

Ohio Adm.Code Rule 4123:1-5-11(E)(6) applies in this situation, and the Employer violated this specific rule. By having one of the levers tied down in a machine that required "two hand control," the Employer circumvented the specific safety rules outlined here. By having employees tie down one of the safety levers in a "two hand control" hydraulic press, this effectively violated the specific safety rules outlined in the Ohio Administrative Code. Based on testimony at the hearing as well as insufficient proof of a defense, the Staff Hearing Officer finds that the tying down of one of the levers was a practice which circumvented Ohio Adm.Code 4123:1-5-11(E)(6). The situation with this lever, in plain site [sic] of other employees and management, are sufficient to appraise an employer of his or her legal obligations towards employees. The tying down of the lever is not in compliance with this code section, and practical inconvenience (possible higher production rate) does not excuse this non-compliance.

Therefore, the Staff Hearing Officer finds that non-compliance with Ohio Adm.Code 4123:1-5-11(E)(6) was the proximate cause of this work injury. This rule was intended to avoid this very type of injury. The Employer was aware, or should have been aware, of this practice of tying down the lever for convenience reasons.

(Stip. at 956-57.)

{¶ 37} Thus, the SHO found Universal violated Ohio Adm.Code 4123:1-5-11(E)(3) and (6). Basing the order on Ladson's testimony, the July 13, 2021 bureau Safety Violations Investigations Unit report, and Ohio Adm.Code 4123:1-5-11(E)(3) and (6), the SHO concluded: "Ohio Adm.Code 4123:1-5-11(E)(3) and Ohio Adm.Code 4123:1-5-11(E)(6) are applicable to this work incident, the employment activity was within the scope of this specific safety requirement and applies to this work injury, the Employer has not complied with this specific safety requirement, and the non-compliance is the proximate cause of this work injury." (Stip. at 957.)

{¶ 38} 13. Universal filed a motion for rehearing with the commission on August 10, 2022. In a September 17, 2022 order, Universal's motion for rehearing was denied.

{¶ 39} 14. Universal filed its complaint in mandamus on October 4, 2022.

## II. Discussion and Conclusions of Law

{¶ 40} Universal asserts entitlement to a writ of mandamus on the basis that the commission acted contrary to law, entered an order not supported by the evidence, and abused its discretion in granting Ladson a VSSR award.

## A. Requirements for Mandamus

{¶ 41} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, a relator must establish a clear legal right to the requested relief, that the commission has a clear legal duty to provide such relief, and the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Belle Tire Distribs. v. Indus. Comm.*, 154 Ohio St.3d 488, 2018-Ohio-2122; *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). In order to prevail in a mandamus action seeking to vacate a factual determination of the commission in granting or denying a VSSR award, the relator must demonstrate that the commission's decision was an abuse of discretion. *State ex rel. Armstrong Steel Erectors, Inc. v. Indus. Comm.*, 144 Ohio St.3d 243, 2015-Ohio-4525, ¶ 13. Where the commission's factual determination is supported by some evidence, it has not abused its discretion and this court must uphold the decision. *State ex rel. Seibert v. Richard Cyr, Inc.*, 157 Ohio St.3d 266, 2019-Ohio-3341, ¶ 44, citing *State ex rel. Pass v. C.S.T. Extraction Co.*, 74 Ohio St.3d 373, 376 (1996).

## B. Law Applicable to Violations of Specific Safety Requirements

{¶ 42} Article II, Section 35 of the Ohio Constitution provides the commission with authority to determine VSSR claims, providing in pertinent part:

> For the purpose of providing compensation to workmen and their dependents, for death, injuries or occupational disease, occasioned in the course of such workmen's employment, laws may be passed establishing a state fund to be created by compulsory contribution thereto by employers, and administered by the state, determining the terms and conditions upon which payment shall be made therefrom. * * * Such board shall have full power and authority to hear and determine whether or not an injury, disease or death resulted because of the failure of the employer to comply with any specific requirement for the protection of the lives, health or safety of employ[e]es, enacted by the General Assembly or

in the form of an order adopted by such board, and its decision shall be final.

R.C. Chapter 4121 "reflects this constitutional provision of authority and addresses VSSR violations." *Zarbana Industries v. Hayes*, 10th Dist. No. 18AP-104, 2018-Ohio-4965, ¶ 17. R.C. 4121.47(A) provides that "[n]o employer shall violate a specific safety rule adopted by the administrator of workers' compensation pursuant to [R.C. 4121.13] or an act of the general assembly to protect the lives, health, and safety of employees pursuant to [Ohio Constitution, Article II, Section 35]." A specific safety requirement is one that is (1) enacted either by the General Assembly or through an order of the Industrial Commission; (2) is specific, not general; and (3) is made for the protection of the lives, health, or safety of employees. *State ex rel. Cotterman v. St. Mary's Foundry*, 46 Ohio St.3d 42, 44 (1989), citing *State ex rel. Trydle, v. Indus. Comm.*, 32 Ohio St.2d 257 (1972), paragraph one of the syllabus.

{¶ 43} "A 'specific requirement' is more than a general course of conduct or general duty or obligation flowing from the employer-employee relationship; rather, it 'embraces such lawful, specific and definite requirements or standards of conduct * * * [that] are of a character plainly to apprise an employer of his legal obligation toward his employees.' " *State ex rel. Precision Steel Servs. v. Indus. Comm. of Ohio*, 145 Ohio St.3d 76, 2015-Ohio-4798, ¶ 17, quoting *Trydle* at paragraph one of the syllabus. Specific safety requirements "must 'forewarn the employer and establish a standard which [the employer] may follow.' " *State ex rel. G & S Metal Prods. v. Moore*, 79 Ohio St.3d 471, 476 (1997), quoting *State ex rel. Howard Eng. & Mfg. Co. v. Indus. Comm.*, 148 Ohio St. 165 (1947), paragraph one of the syllabus. "[S]pecific safety requirements are ' "intended to protect employees against their own negligence and folly as well as to provide them a safe place to work." ' " *State ex rel. Byington Builders, Ltd. v. Indus. Comm. of Ohio*, 156 Ohio St.3d 35, 2018-Ohio-5086, ¶ 40, quoting *Cotterman* at 47, quoting *State ex rel. U.S. Steel Corp. v. Cook*, 10 Ohio App.3d 183, 186 (10th Dist.1983). Thus, a "VSSR award is intended to penalize employers for failing to comply with [specific safety requirements], and only those acts within the employer's control should serve as the basis for establishing a VSSR." *State ex rel. Ohio Paperboard v. Indus. Comm. of Ohio*, 152 Ohio St.3d 155, 2017-Ohio-9233, ¶ 20.

{¶ 44} "An award for a VSSR is 'a new, separate, and distinct award' over and above standard workers' compensation benefits. It is not covered by an employer's workers' compensation premium." *State ex rel. Precision Steel Servs. v. Indus. Comm. of Ohio*, 145 Ohio St.3d 76, 2015-Ohio-4798, ¶ 15, quoting *State ex rel. Newman v. Indus. Comm.*, 77 Ohio St.3d 271, 272 (1997). In order to prove a VSSR claim, a claimant must establish that (1) an applicable and specific safety requirement was in effect at the time the injury occurred, (2) the employer failed to comply with the requirement, and (3) the failure to comply was the proximate cause of the injury in question. *State ex rel. Scott v. Indus. Comm. of Ohio*, 136 Ohio St.3d 92, 2013-Ohio-2445, ¶ 11.

{¶ 45} "Because a VSSR award is a penalty, a specific safety requirement must be strictly construed and all reasonable doubts concerning the interpretation must be resolved in favor of the employer." *State ex rel. 31, Inc. v. Indus. Comm.*, 152 Ohio St.3d 350, 2017-Ohio-9112, ¶ 21, citing *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170, 172 (1989). However, "the strict-construction rule does not apply in resolving factual disputes," and such rule "permits neither the commission nor a reviewing court to construe the *evidence* of a VSSR strictly in the employer's favor." (Emphasis sic.) *State ex rel. Supreme Bumpers, Inc. v. Indus. Comm.*, 98 Ohio St.3d 134, 2002-Ohio-7089, ¶ 70.

{¶ 46} Ohio Adm.Code Chapter 4123:1-5 sets forth specific safety requirements relating to workshop and factory safety. *See* Ohio Adm.Code 4123:1-5-01(A). Ohio Adm.Code 4123:1-5-11(E),[4] which applies to hydraulic or pneumatic presses, provides as follows:

> Every hydraulic or pneumatic (air-powered) press shall be constructed, or shall be guarded, to prevent the hands or fingers of the operator from entering the danger zone during the operating cycle. Acceptable methods of guarding are:

---

[4] Following Ladson's workplace injury on April 26, 2019, Ohio Adm.Code 4123:1-5-11(E) was amended twice effective February 1, 2022 and June 30, 2023. The amendments, as relevant here, in part replaced "shall" with "will" in two instances in Ohio Adm.Code 4123:1-5-11(E). Because a claimant must prove that "an applicable and specific safety requirement exists, which was *in effect at the time of the injury*," the former versions of the administrative code in place at the time of the incident on April 26, 2019 apply in this matter. (Emphasis added.) *State ex rel. DeMarco v. Indus. Comm.*, 10th Dist. No. 19AP-227, 2021-Ohio-1937, ¶ 6. Thus, all references in this matter to Ohio Administrative Code provisions relating to the alleged specific safety requirement violations are to the versions of the code in effect at the time of Ladson's workplace injury.

(1) "Fixed barrier guard" - an enclosure to prevent hands or fingers from entering the danger zone;

(2) "Gate guard" - a movable gate operated with a tripping device to interpose a barrier between the operator and the danger zone and to remain closed until the down stroke has been completed;

(3) "Two-hand control" - an actuating device which requires the simultaneous use of both hands outside the danger zone during the entire closing cycle of the press;

(4) Pull guard - attached to hands or wrists and activated by closing of press so that movement of the ram will pull the operator's hands from the danger zone during the operating cycle;

(5) Restraint or hold-back guard - with attachments to the hands or wrists of the operator to prevent hands or fingers entering the danger zone during the operating cycle;

(6) Other practices, means or methods which will provide safeguards, preventing the hands or fingers of the operator from entering the danger zone during the operating cycle and which are equivalent in result to one of the types specified above.

Ohio Adm.Code 4123:1-5-11(E). The term "operator" is defined as "any employee assigned or authorized to work at the specific equipment." Ohio Adm.Code 4123:1-5-01(B)(92).[5]

## C. Application

{¶ 47} Here, the SHO found Universal violated Ohio Adm.Code 4123:1-5-11(E)(3) and (6).[6] The SHO found that "the safety mechanism (two lever operation) of the hydraulic press was bypassed by someone." (Stip. at 956.) The SHO found it was "not refuted that this left lever was tied down when this work injury occurred" and, further, found "the Injured Worker's testimony credible that this left lever was tied down." (Stip. at 956.) The SHO concluded that "Ohio Adm.Code 4123:1-5-11(E)(3) and Ohio Adm.Code 4123:1-5-11(E)(6) are applicable to this work incident, the employment activity was within the scope of this specific safety requirement and applies to this work injury, the Employer has not complied

---

[5] Ohio Adm.Code 4123:1-5-01 was also amended effective February 1, 2022 and June 30, 2023. Those amendments are not at issue in this matter.
[6] It is undisputed that only the alleged violations of Ohio Adm.Code 4123:1-5-11(E)(3) and (E)(6) are at issue in this matter because Ladson dismissed all other alleged violations prior to the VSSR hearing before the SHO.

with this specific safety requirement, and the non-compliance is the proximate cause of this work injury." (Stip. at 957.)

{¶ 48} Universal asserts the commission erred in granting the VSSR award for several reasons. For ease of discussion, these are addressed out of order beginning with Universal's third argument.

*1. Universal's Third Argument—Whether Order Supported by Some Evidence*

{¶ 49} In its third argument, Universal contends the commission abused its discretion by entering an order not supported by any evidence in the record. With regard to the first element of a VSSR claim, there is no dispute that the press in question was a hydraulic press subject to an applicable specific safety requirement in effect at the time the injury occurred, i.e., Ohio Adm.Code 4123:1-5-11(E). Universal was plainly apprised of its duty to ensure that the press was constructed or guarded to prevent the hands or fingers of the operator from entering the danger zone during the operating cycle. As relevant to the violations alleged by Ladson, Universal was required to employ an acceptable method of guarding, including a "[t]wo-hand control" or "[o]ther practices, means or methods which will provide safeguards, preventing the hands or fingers of the operator from entering the danger zone during the operating cycle and which are equivalent in result to one of the types specified above." Ohio Adm.Code 4123:1-5-11(E)(3) and (6). Thus, the first element of a VSSR claim is met in this instance as an applicable specific safety requirement was in effect at the time of Ladson's injury.

{¶ 50} Regarding the second element for a VSSR claim, some evidence in the record supports that Universal failed to comply with Ohio Adm.Code 4123:1-5-11(E)(3) and (6). Universal claims that the "press's two-hand actuating device complies with Ohio Adm. Code 4123:1-5-11(E)(3) because the operator must press both handles down at the same time." (Universal's Brief at 2.) Ladson testified that every time he operated the press, one of the two levers was always tied down, and, therefore, was disabled. Thus, according to Ladson, it was only necessary to use the lever that was not tied down in order to actuate the press. He testified that the press operated when the operator would "push *the lever*," indicating only a single lever was required. (Emphasis added.) (Stip. at 841.) Ladson believed that having one lever tied down was "normal operating procedure." (Stip. at 858.)

{¶ 51} Some evidence supports finding Universal was aware the lever was tied down and disabled. Ladson stated he was trained to operate the machine using only one lever. Ladson specifically indicated that either Sherry Whitting or Mitch Wilson, who were employed in supervisory or lead positions at Universal, trained him on the machine and that he was trained to only use one lever. At the hearing, the commission SHO engaged in the following dialogue with Ladson:

[Hearing Officer]: So Sherry trained you on that machine?

[Ladson]: It was either Sherry or Mitch in 2017 when I first started.

[Hearing Officer]: Just to reiterate my recollection is that you said that a rag was tied down every time that you used that machine.

[Ladson]: Yes. Every time that I operated it it was tied down.

[Hearing Officer]: Did you ever have any discussion with anybody prior to your injury about that rag?

[Ladson]: No, I didn't think anything of it. I didn't think it would cause injury or anything. I didn't know the operation as far as the mechanics of it. I was just shown push the one lever down and it comes up.

[Hearing Officer]: Did it ever come to your mind, wait a minute, this rag is here to circumvent something, maybe it's not safe to use it?

[Ladson]: No. That's how it was demonstrated to me. I just thought that's how it was.

[Hearing Officer]: So, whoever the person was that showed you, whether it was Sherry or Mitch, your testimony is they just did the one lever?

[Ladson]: That's correct.

(Stip. at 858-59.)

{¶ 52} Moreover, Ladson indicated Whitting and Wilson would have been able to see the press operating with only one lever. Ladson stated that Wilson and Whitting had walked by him while he was working at the press on the day of the injury and had not said anything to him about the tie. When he was asked whether "[i]f there was a rag on that handle it would be plainly visible to anyone walking through," Ladson replied: "Yes. Including Mitch, and including Sherry." (Stip. at 848.) Ladson stated that the press was checked by supervisors before an employee began to operate it. In addition to the lever

being within the plain view of Wilson and Whitting, Ladson testified that maintenance "would come work on" the press during his shift, although he could not say how many times this occurred. (Stip. at 843.)

{¶ 53} It is undisputed that Ladson worked on the press multiple times, not just on the day of his injury. Although Ladson had only operated the machine for approximately three to four hours on the day of his injury, he agreed that he worked on the press in question for approximately 40 hours or more before he was injured. Wilson testified that Ladson had worked on the press for "over 20 hours." (Stip. at 856.) Again, Ladson stated that the lever was tied down "every time that [he] operated" the press. (Stip. at 859.) Although Ladson did not know who tied down the lever on the press, Ladson expressed incredulity that Universal's management was unaware that the lever had been tied down, stating: "I'm saying how is it possible that for them not to know. They see it. How could they not see it? That's what I'm saying." (Stip. at 850.) Asked whether it was true that Ladson "used that machine at least three times, maybe more, before he got hurt, and every time he used that machine the handle was tied down," Wilson responded: "I could not -- I don't understand why because *I walk right by it*. We have *people walking by it all the time*." (Emphasis added.) (Stip. at 854.) Furthermore, Wilson admitted that he had seen the lever tied down once approximately ten years before Ladson was injured. In that instance, Wilson stated that "[w]e walked up on the individual and saw the handles tied down, and he got a written warning on it." (Stip. at 854.)

{¶ 54} Thus, some evidence supports finding that a two-hand control method of guarding was not employed on the press at issue. Because only one hand was required to operate the press because the other lever was tied down, the press was not equipped an "actuating device which requires the simultaneous use of both hands outside the danger zone during the entire closing cycle of the press." Ohio Adm.Code 4123:1-5-11(E)(3). *See State ex rel. Amanda Bent Bolt Co. v. Indus. Comm.*, 10th Dist. No. 14AP-295, 2015-Ohio-3487, ¶ 4 (finding "pull guard did not pull the claimant's hands from the danger zone during the operating cycle because the pull guard was not properly adjusted"). Nor were there any "[o]ther practices, means or methods which will provide safeguards, preventing the hands or fingers of the operator from entering the danger zone during the operating cycle and which are equivalent in result to one of the types specified [in Ohio Adm.Code 4123:1-5-

11(E)(1)-(5)].” Ohio Adm.Code 4123:1-5-11(E)(6). Thus, some evidence supports the SHO's finding that Universal failed to comply with Ohio Adm.Code 4123:1-5-11(E)(3) and (6).

{¶ 55} Finally, some evidence supports finding Ladson established the third element of a VSSR claim, namely that Universal's failure to comply with the specific safety requirement was the proximate cause of the injury in question. Ladson testified that the machine was able to be operated by using only the right lever because the other lever was tied down. Universal admits that Ladson "was injured when the left handle on the press was tied down with a rag allowing his right hand to enter the danger zone during the closing cycle of the ram." (Universal's Brief at 5.) Thus, the lack of an acceptable method of guarding allowed the press in question to be operated with only one hand, thereby allowing Ladson's other hand to be placed in the danger zone during the operating cycle. As the SHO found, the specific safety requirement at issue "was intended to avoid this very type of injury." (Stip. at 957.) From the testimony in the record, there exists some evidence to support the SHO's finding that the noncompliance with Ohio Adm.Code 4123:1-5-11(E)(3) and (6) was the proximate cause of Ladson's work injury. As a result, Universal's argument that the SHO's order is not supported by any evidence in the record is not well-taken.

*2. Universal's First Argument—Whether Commission Misinterpreted and Misapplied the Specific Safety Requirement*

{¶ 56} In its first argument, Universal asserts the SHO misconstrued and misapplied the applicable specific safety requirement by reading into it a surveillance or inspection requirement not explicitly set forth anywhere in the applicable rule. Although Universal frames its contentions in support of this argument in terms of an error in the interpretation of the applicable provisions of the Ohio Administrative Code, its arguments in actuality appear to involve a dispute about the weight or credibility of the evidence.

{¶ 57} Universal contends that the "supervisor of the shift immediately prior to [Ladson's] set up the machine and established that the rag was not on the left handle" and that "[t]his was confirmed by the lead individual, Sherry Whitting, who checked the press earlier that morning during the shift prior to [Ladson's]." (Universal's Brief at 21.) At the hearing before the SHO, Ladson was asked about Whitting's knowledge of the tied handle and the statements of Brian Klein, who Wilson identified as the night shift supervisor:

[Universal's counsel]: And you never reported to Sherry Whitting there was a rag on that handle. True?

[Ladson]: No. Her desk was right there. She could see it.

* * *

[Universal's counsel]: Mr. Klein stated in his affidavit, "neither handle on the press was tied down or otherwise restrained or disabled in any way." Any reason to disagree with that?

[Ladson]: Yes.

(Stip. at 848-49.)

{¶ 58} Furthermore, Universal contends that Ladson "was provided with training on the usage of these presses and instruction on reporting to supervisors if a machine was disabled." (Universal's Brief at 21.) Ladson repeatedly testified that he was trained to operate the press in question using only one lever. Ladson specifically mentioned that either Whitting or Wilson trained him to operate the press in this manner. Additionally, Ladson testified that he was not provided "adequate safety training." (Stip. at 847.)

{¶ 59} The commission is "exclusively responsible for assessing the weight and credibility of evidence." *State ex rel. George v. Indus. Comm.*, 130 Ohio St.3d 405, 2011-Ohio-6036, ¶ 11, citing *State ex rel. Burley v. Coil Packing, Inc.*, 31 Ohio St.3d 18 (1987). Where the commission's decision is supported by some evidence, the presence of contrary evidence in the record is immaterial. *State ex rel. West v. Indus. Comm.*, 74 Ohio St.3d 354, 356 (1996), citing *Burley*. Although Universal clearly disagrees with the SHO's determinations regarding credibility and the weight of the evidence, such determinations are not reviewable in mandamus where some evidence supports the order.

{¶ 60} Additionally, Universal's argument appears not to accurately reflect the text of the SHO's order. Specifically, Universal contends that "[a]ccording to the SHO's order, although the subject press complied with Ohio Adm.Code 4123:1-5-11(E)(3), as it was equipped with a 'two-hand control,' [Universal] still violated that [specific safety requirement] because, per the Commission's interpretation of subsection (E)(6), [Universal] was also required to know when someone had disabled the compliant two-hand control, leaving the machine effectively unguarded." (Emphasis removed.) (Universal's Brief at 16.) The SHO's order did not find that the press in question "complied with Ohio Adm.Code 4123:1-5-11(E)(3)" as stated in Universal's brief. Rather, the SHO specifically

found that "[t]he Employer violated Ohio Adm.Code 4123:1-5-11(E)(3) and Ohio Adm.Code 4123:1-5-11(E)(6)." (Stip. at 957.) Furthermore, the SHO found that Ohio Adm.Code 4123:1-5-11(E)(3) "applies, and violations pertaining to this machine are covered by the section." (Stip. at 956.)

{¶ 61} Next, citing to *State ex rel. Penwell v. Indus. Comm.*, 142 Ohio St.3d 114, 2015-Ohio-976, Universal asserts this court should grant its request for a writ of mandamus "as Mr. Wilson did not have a duty of constant surveillance over the equipment." (Universal's Brief at 22.) In *Penwell*, the VSSR claimant was injured after a pullback safety system on a press failed. The claimant alleged a violation of Ohio Adm.Code 4123:1-5-11(E). The court found the "evidence shows that the pullback safety system was in good working order on the date of the accident." *Penwell* at ¶ 23. Another worker operated the same machine prior to the claimant on the same day as the claimant's injury and did not detect any problem with the safety equipment. The pullback safety system was then adjusted specifically for the claimant by another employee, who was described as a set-up person. The set-up person also noticed nothing out of the ordinary. The claimant operated the machine several times before the injury occurred. The employer also provided evidence that similar presses had been operated for at least 38 years without a single failure of a pullback guard.

{¶ 62} Rejecting the claimant's argument that the employer knew that the pullback safety system would someday fail because it trained its employees not to rely solely on the safety system to keep their hands safe, the court found that "the unrefuted evidence here is that the safety pullbacks had never failed or malfunctioned on the press in question, nor had [the employer] been aware of any pullback malfunction on any of its presses for nearly four decades." *Id.* at ¶ 24. The court stated that "[s]afety regulations do not impose strict liability on employers whenever a safety device fails." *Id.* at ¶ 25. The court also rejected the claimant's argument that a set-up person should have supervised her when she put the pullbacks back on after removing them. The court stated that Ohio Adm.Code 4123:1-5-11(E) "does not impose a duty of constant surveillance over the equipment." *Id.* at ¶ 26.

{¶ 63} The facts in this matter are dissimilar to those in *Penwell*. Unlike in *Penwell*, the guarding mechanism on the press at issue in this case did not fail due to a malfunction, but rather was deliberately disabled by the tying down of one of the two levers. Also, unlike

the employer's lack of awareness of the safety system failure in *Penwell*, the record in this case contains some evidence supporting a finding that Universal was aware that one of the levers on the press was tied down, thereby disabling the two-hand control guarding mechanism. Ladson testified that he was trained to use the press using only one lever. Ladson testified that the tying down of one lever of the press was visible to other employees walking by, including Whitting and Wilson. Ladson also testified that he used the press on more than one occasion and that every time he used the press, one lever was tied down. Thus, some evidence in the record reflects that Universal was aware of the disabling of the two-hand control guarding mechanism on the press resulting from the tying down of one of the two levers. The SHO's order did not impose strict liability or a duty of constant surveillance on Universal. Universal's first argument is not well-taken.

### 3. Universal's Fourth Argument—Whether Unilateral Negligence Defense Applies

{¶ 64} In its fourth argument, Universal contends the SHO committed an abuse of discretion by ignoring competent, credible evidence that Ladson's injury was proximately caused by his unilateral, negligent conduct alone, including ignoring his training and Universal's safety rules. "Because the critical issue in a VSSR claim is always whether the employer complied with the [specific safety requirement], * * * an employee's conduct, even if negligent, is not relevant to a VSSR determination unless the injury is caused by the claimant's deliberate circumvention or disabling of a safety device or refusal to use employer-provided safety equipment." *State ex rel. Sunesis Constr. Co. v. Indus. Comm.*, 152 Ohio St.3d 297, 2018-Ohio-3, ¶ 29. *See State ex rel. Quality Tower Serv., Inc. v. Indus. Comm.*, 88 Ohio St.3d 190, 193 (2000), quoting *Cotterman*, 46 Ohio St.3d at 47 (stating that the unilateral negligence "defense is not actually about an employee's *negligence*," but instead "[t]he employer * * * avoids VSSR liability when '[the] employee unilaterally *violates* a safety requirement' " (Emphasis sic.)). A "unilateral-negligence * * * defense 'is available *only if the employer first complies with the applicable safety requirement.*' " (Emphasis sic.) *Byington Builders*, 2018-Ohio-5086, at ¶ 39, quoting *State ex rel. Glunt Indus. v. Indus. Comm.*, 132 Ohio St.3d 78, 2012-Ohio-2125, ¶ 16. *See Amanda Bent Bolt*, 2015-Ohio-3487, at ¶ 6 ("It is well-settled that a claimant's alleged negligence is a defense only when the employer has first complied with the relevant safety requirements and the

claimant deliberately renders an otherwise complying device noncompliant."). "Specific safety requirements are " 'intended to protect employees against their own negligence and folly as well as provide them a safe place to work." ' " *State ex rel. Pressware Internatl. v. Indus. Comm.*, 85 Ohio St.3d 284, 288 (1999), quoting *Cotterman* at 47, quoting *U.S. Steel*, 10 Ohio App.3d at 186.

{¶ 65} Universal argues that "Ladson's unilateral actions—failing to report to his supervisors that one of the two-hand controls was disabled, failing to remove the rag holding the handle down, and continuing to use the press without the required guard— violated his duty to follow company safety protocols." (Universal's Brief at 31.) Citing to the transcript of the hearing before the commission SHO, Universal states that "Ladson admits [Universal] did not disable the lever." (Universal's Brief at 32.) The transcript pages cited by Universal in support of this assertion do not reflect such an admission by Ladson. Rather, under cross-examination by Universal's counsel, Ladson testified as follows:

[Universal's counsel]: Let's be clear, you're not saying that Mitch Wilson
            tied down the handle?

[Ladson]: I don't know who tied it.

[Universal's counsel]: And you're not saying that David Clair tied down the
            handle?

[Ladson]: No.

[Universal's counsel]: You're not saying that the owner of the company
            tied down the handle?

[Ladson]: No.

[Universal's counsel]: And you're not saying that anybody in management
            tied down the handle?

[Ladson]: I'm not saying that.

[Universal's counsel]: And you're not saying that anybody in management
            even knew that the handle was tied?

[Ladson]: I'm saying how is it possible that for them not to know. They see
            it. How could they not see it? That's what I'm saying.

(Stip. at 850.) Thus, Ladson testified that he did not know who tied the lever down.[7] Furthermore, Universal's argument again neglects Ladson's testimony that he was

---

[7] Notably, Universal does not argue that Ladson himself tied down the left lever on the press on the day of the injury or at any other time.

trained by either Wilson or Whitting to operate the press in question using only one lever with the other lever tied down or disabled. Ladson testified that prior to the injury he always operated the press with only one lever while the other was tied down. Ladson stated that he believed operating the press with only one lever was "normal operating procedure." (Stip. at 858.)

{¶ 66} Thus, the record contains some evidence to support finding that Ladson did not unilaterally violate the specific safety requirement by deliberately circumventing or disabling a safety device or refusing to use employer-provided safety equipment. Furthermore, the testimony, particularly the testimony related to Ladson's training on the press to use one lever and use of one lever as a normal operating procedure, provides some evidence supporting a finding that Universal did not, in the first instance, satisfy its obligation of equipping the press with an acceptable method of guarding. *See Amanda Bent Bolt*, 2015-Ohio-3487, at ¶ 6 (stating the employer did not first comply with the relevant safety requirements because the safety device was not properly adjusted by the employer, and, therefore, unilateral negligence defense did not apply). As a result, the SHO correctly found Universal failed to establish a defense to the VSSR application as the unilateral negligence defense does not apply in this instance.

### 4. Universal's Second Argument—Whether Commission Shifted the Burden of Proof

{¶ 67} Finally, in its second argument, Universal contends the SHO impermissibly shifted the burden of proof to require Universal to disprove a prima facie VSSR claim—when it is the employee who is required to prove that a VSSR occurred in the first instance by a preponderance of the evidence. Universal argues "the SHO presumed a violation because the handle was tied down by 'someone' within a short time duration of several hours, despite the absence of any evidence that [Universal] was aware the lever was tied down, and then the SHO improperly required [Universal] to rebut this presumption with evidence that [Universal] and its managers did not disable the press guard." (Universal's Brief at 23.) Universal presents a series of "facts" as "undisputed" in support of its argument that Ladson presented "no evidence" that Universal violated a specific safety requirement. (Universal's Brief at 24.)

{¶ 68} Although Universal again asserts that Ladson presented no evidence that Universal violated a specific safety requirement, the fact remains that Ladson testified the left lever was always tied down when he operated the press, which he operated on multiple occasions prior to the day of his injury. Furthermore, Ladson testified he was trained by a Universal supervisor or lead person to operate the press with the lever tied down. Again, it is not this court's role to reweigh or second-guess the evidence or the inferences raised therefrom. *George*, 2011-Ohio-6036, at ¶ 11; *West*, 74 Ohio St.3d at 356.

{¶ 69} Universal also argues that "the SHO's finding that [Universal] violated the [specific safety requirement] is based, in part, on [Universal's] 'insufficient proof of a defense.' " (Universal's Brief at 23.) Contrary to Universal's contention, the SHO did not shift the burden for establishing a VSSR claim, but simply found that Universal failed to prove an applicable defense, such as the aforementioned unilateral negligence defense raised by Universal. Universal's second argument is without merit.

**D. Conclusion**

{¶ 70} Based on the foregoing, Universal has not demonstrated that the commission abused its discretion or erred as a matter of law in finding Universal violated a specific safety requirement. Therefore, Universal has not demonstrated a clear legal right to the requested relief or that the commission is under a clear legal duty to provide such relief. Accordingly, it is the decision and recommendation of the magistrate that Universal's request for a writ of mandamus should be denied.

/S/ MAGISTRATE
JOSEPH E. WENGER IV

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on
appeal the court's adoption of any factual finding or legal

conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.